Charles D. BONEY, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 22A01–0607–CR–310.

Court of Appeals of Indiana.

Jan. 29, 2008.

John Pinnow, Greenwood, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-defendant Charles Boney appeals his convictions for three counts of Murder,[1] a felony, one count of Conspiracy to Commit Murder,[2] a class A felony, and the finding that he was a habitual offender.[3] Specifically, Boney argues that his convictions must be reversed because: (1) the trial court erred in permitting the State to exercise a peremptory challenge regarding a prospective juror who was African American; (2) certain pretrial statements that Boney gave to police officers were improperly admitted into evidence; (3) the trial court abused its discretion in denying a motion for a mistrial based on comments made by two of the State's witnesses regarding Boney's previous incarceration; (4) the trial court erred in refusing to give his proffered instruction on accomplice liability; and (5) the trial court should have granted his motion to correct error based on juror misconduct. Finding no reversible error, we affirm the judgment of the trial court.

### FACTS

The facts, as reported in *Camm v. State,* 812 N.E.2d 1127 (Ind.Ct.App.2004), are as follows:

On the evening of September 28, 2000, [David] Camm shot and killed his wife Kim and their children, seven-year-old Brad and five-year-old Jill, at their home in Georgetown. The shooting took place in the Camms' garage, apparently sometime after 7:30 p.m., when Kim and the children would have been

---

1. Ind.Code § 35–42–1–1.

2. I.C. § 35–42–1–1; I.C. § 35–42–5–2.

3. Ind.Code § 35–50–2–8.

due to arrive home from Brad's swimming practice. Camm's version of events was that he was playing basketball at a nearby church from 7:00 p.m. until approximately 9:20 p.m., after which he drove home and found Kim, whom he immediately thought was dead, lying on the ground next to her Bronco. He then claimed to have looked inside the vehicle and found Jill and Brad. Camm thought Brad might still be alive, so he reached in over Jill, removed him from the Bronco, placed him on the garage floor next to Kim, and began performing CPR. When this proved futile, Camm said he called the Sellersburg Indiana State Police post for help, then ran across the street to his grandfather's house to tell his uncle, who was staying there, what had happened. Camm had been a State Police trooper for many years, but had quit the force several months earlier to work for a family business that, among other things, waterproofed basements.

Police showed the t-shirt Camm was wearing on the night of the 28th to a blood spatter expert. The expert believed certain blood droplets, which were later confirmed to be from Jill, found on one corner of the shirt were high velocity impact spatter resulting from a gunshot. Based in part on this evidence, on October 1, 2000, the State charged Camm with three counts of murder.

On January 7, 2002, a jury trial began.... The trial continued in Floyd County until March 15, 2002, when the jury retired to deliberate. The key physical evidence against Camm was the purported high velocity blood spatter on his t-shirt, which was challenged by Camm's forensic expert. The State also presented extensive evidence of Camm's personal life, specifically, evidence that

he had had several sexual encounters with or propositioned women other than Kim during his time with the State Police. On March 17, 2002, the jury informed the trial court that it was deadlocked; the trial court instructed the jury to continue deliberating. Later that day, the jury returned with guilty verdicts on all three counts. Camm was sentenced to a total of 195 years. *Id.* at 1129–30. Camm appealed his convictions, and this court reversed, determining, among other things, that evidence of Camm's history of marital infidelity, which had been admitted at trial, was prejudicial and that the "tie between such evidence and motive, or anything other than simply portraying Camm as 'bad,' is too strained and remote to be reasonable." *Id.* at 1134.

Following Camm's appeal, Detective Gary Gilbert and Sergeant Mike Black of the Indiana State Police were assigned to reinvestigate the murders. On February 14, 2005, Detective Gilbert learned that DNA found on a collar of the sweatshirt, which had been tucked underneath Bradley's body, matched that of Boney. Additionally, fibers discovered on the sweatshirt were consistent with carpeting in the Camms' residence.

On February 17, 2005, Louisville Metro Police Officers located Boney. Detective Gilbert and Wayne Kessinger, an investigator with the prosecutor's office who was retired from the Louisville Police Department, were notified. Detective Gilbert and Investigator Kessinger informed Boney that they needed to speak with him about a "serious matter." Tr. p.1948. As a result, Boney agreed to go to the Floyd County Prosecutor's office and speak with the detectives. At approximately 4:00 p.m. that day, the police officers advised Boney of his *Miranda*[4] rights, at which time Bo-

---

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ney acknowledged that he understood those rights.

Boney was then shown the sweatshirt and identified it as his. Boney stated that he had deposited the garment at a Salvation Army drop box in July or August 2000. Boney then told the officer that he had never met Camm and that he never had any weapons. Boney also denied being at the crime scene and claimed that he did not assist Camm in killing the victims.

Boney agreed to take a polygraph examination regarding his involvement in the murders. Boney stipulated to the admissibility of the results in court and signed a consent form at approximately 7:55 p.m. Following the test, the polygraph examiner concluded that Boney was deceptive in answering whether he had shot anyone in Indiana, whether he was present during the shootings of the Camms, and whether he had seen the person who shot them.

Detective Gilbert and Investigator Kessinger resumed their questioning of Boney. Boney again denied that he knew Camm or that he was present at the crime scene. The questioning ceased at approximately 6:30 a.m. on February 18, 2005. Boney was then released, but the police placed a tracking device on his vehicle.

The next day, Boney's vehicle was tracked to the vicinity of the cemetery where the victims were buried. Boney went to the funeral home and inquired about a mausoleum for himself, his mother, and his sister. A representative from the cemetery quoted Boney a price of $201,000 for the mausoleums. Boney responded that he could make an $80,000 down payment on the mausoleums, although he acknowledged that he was working three part-time jobs and earning minimum wage. The tracking device also showed that Boney's vehicle traveled within one-half mile of the location where Camm had been working.

On March 4, 2005, a latent print examiner matched Boney's palm print to a print that was found on the Bronco's exterior. Later that day, Boney again agreed to speak with the detectives. At approximately 2:00 p.m., Detective Gilbert again advised Boney of the *Miranda* warnings. During questioning, Boney initially gave statements that were consistent with his previous interview. However, after Detective Gilbert told Boney about the palm prints, Boney mentioned Camm and requested an attorney. Investigator Kessinger continued the questioning for another minute or so, and Boney stated, "All I know is David Camm was the shooter" and "that's all I'm gonna say until I get an attorney." Tr. p. 180, 226, 359. Detective Gilbert and Investigator Kessinger then left the room.

Boney was arrested and charged in the Camm murders. A short time later, a police officer contacted Detective Gilbert and informed him that Boney wanted to see him. As a result, at 4:45 p.m. on March 4, Boney signed a form stating that he had once requested the presence of counsel, but no longer desired an attorney and wanted to speak to police. Boney informed the detectives that he wanted to issue a written statement. After Boney had written two sentences, the detectives left the interrogation room at Boney's request. Boney then completed a five-page statement, indicating that he first met Camm in July or August 2000. Boney saw Camm again at a grocery store in September, at which time Camm asked Boney if he had a "clean gun." *Id.* at 2208. Boney wrapped a Lorcin .380–caliber handgun in a sweatshirt and gave it to Camm in exchange for $250. Boney stated that Camm did not tell him what he was going to do with the gun. However, it was determined that a Lorcin .380 was used to kill the Camms. Boney then explained to the in-

vestigators that he had purchased the gun for Camm and that he must have placed his palm on the Bronco when he delivered it to Camm. Boney then stated that he had purchased the gun from another individual who had had it in his trunk. Boney initially wrapped the gun in a plastic bag and explained that some of the oil from the gun must have spilled onto his sweatshirt when he wrapped the gun in it. A short time later, the interview ceased and Boney was returned to jail.

On March 7, 2005, Indiana State Police Sergeant Myron Wilkerson went to the jail and spoke with Boney at approximately 3:45 p.m. Sergeant Wilkerson, who was a friend of the Boney family, had previously talked with Boney's mother. As a result of that conversation, Sergeant Wilkerson believed that Boney wanted to see him. Sergeant Wilkerson advised Boney of his *Miranda* rights and Boney signed a waiver of rights form. Sergeant Wilkerson and Boney talked for approximately two and one half hours. Approximately forty minutes into the interview, Boney told Sergeant Wilkerson that he had followed Camm to the residence, waited outside, and waved to Kim Camm when she arrived. Boney claimed that he heard Camm and Kim talking and eventually heard Kim say "no," which was followed by a gunshot. Tr. p. 2286–88, 2317, 2501. Boney then heard Brad say "Daddy," which was followed by two more gunshots. *Id.* Boney told Sergeant Wilkerson that Camm came outside, pointed the gun at him, and pulled the trigger. However, the gun misfired. Boney then told Sergeant Wilkerson that he ran inside the garage toward Camm and that Camm ran into the residence saying "you did this." *Id.* at 2289, 2320–21.

At the conclusion of the interview, Detective Gilbert and Investigator Kessinger walked into the room and spoke with Bo-

ney. Boney stated that he saw Kim on the ground next to the Bronco and tripped over Kim's shoes. Boney claimed that he picked up the shoes and placed them on top of the Bronco. Boney then observed that Jill was still in her seatbelt and Brad was doubled over in the Bronco in the rear seat on the passenger side. As Boney was leaving the scene, he claims that he saw a woman pull into Camms' driveway. Boney claimed that he did not report the crimes because his sweatshirt was still at the scene. Moreover, Boney contended that no one would believe that Camm was the shooter because Boney was an African American.

When Boney was in jail, he wrote an autobiography entitled *Backbone,* in which he admitted that he sold a gun to Camm and that he was present when the murders were committed. Boney also wrote approximately 150 letters to his fiancée and fellow inmate Tina Edwards. In those letters, Boney explained that he had sold Camm at least one gun and that he had known that Camm was going to kill his wife. Boney also admitted to Edwards that he was present when the shootings occurred, and that Camm was going to pay him with some of Kim Camm's life insurance proceeds.

The trial court began jury selection on December 12, 2005. At the end of the first day, Boney objected to the State's peremptory challenge to Juror 16, an African American male. The State based its challenge on four of Juror 16's responses to the jury questionnaire. Specifically, Juror 16 indicated he could not find Boney guilty because he believed that Camm had "set Boney up." Tr. p. 641–45. As a result, the State exercised a peremptory challenge and moved to have the juror stricken from the panel. Boney moved for a mistrial, but the trial court determined that there were other African American jurors

remaining on the panel. As a result, the trial court denied Boney's motion for mistrial.

At trial, Mala Singh Mattingly, a former girlfriend of Boney's, testified that Boney told her one afternoon that he was "going to help a buddy" and left with his backpack. *Id.* at 2843–45. When Boney returned at approximately 11:30 that same evening, he showed Mattingly a gun that was wrapped in a gray sweatshirt that he had been wearing. The next morning, Mattingly heard helicopters and watched live television coverage about "some type of murder" in the area. *Id.* at 2848, 2850.

Karen Ancil, a church administrator who met Boney when he was incarcerated, testified that Boney telephoned her on September 28, 2000, and they talked for over two hours. Ancil further testified that Boney visited her several days after the shootings to celebrate her birthday and that it was the first time she had seen him "outside of incarceration." *Id.* at 2672. After Boney moved for a mistrial, the trial court instructed the jury that it was to ignore the statement regarding Boney's prior incarceration. Boney again renewed his motion for a mistrial, which the trial court denied.

Prison inmate Richard Cole also testified for the State. On direct examination, Cole testified that he was nervous about testifying against someone who may have been involved in some murders. When the prosecutor asked Cole if Boney had talked to him about the murders, Cole testified that they were watching television and talking about the case "*in the block.*" *Id.* at 2895 (emphasis added). When Boney moved for a mistrial, on the basis that "block" referred to jail, the trial court determined that the jury could have interpreted the word "block" in several different ways. *Id.* at 2896. Thus, Boney's motion for mistrial was denied. Cole then

testified that he knew Boney's nickname because he "was in prison with him." *Id.* at 2901. Again, the trial court denied Boney's motion for a mistrial because it did not want to draw more attention to Boney's incarceration. As a result of Cole's remarks, the State agreed to strike Cole's testimony and remove him as a State's witness. The trial court ordered the same and denied Boney's motion for a mistrial.

Following the presentation of the evidence, Boney offered an instruction regarding accomplice liability. The proposed instruction included language that the jury was required to find that Boney supplied the weapon to Camm "with the intent or knowledge that the weapon would be used to commit the murder(s)" before Boney could be found guilty of the charged offenses. *Id.* at 3140–41. The trial court denied Boney's proposed instruction and gave an Indiana Pattern Jury Instruction, which, among other things, tracked the language of the Aiding an Offense statute. The jury was also instructed on the statutory definition of murder.

The jury found Boney guilty as charged. Thereafter, on February 23, 2006, the trial court sentenced Boney to consecutive sentences of sixty-five years on each murder count, with the third count enhanced by thirty years following a finding that Boney was a habitual offender. Boney was also sentenced to fifty years for conspiracy to commit murder, which was ordered to run concurrently with the murder sentences. As a result, Boney received an aggregate sentence of 225 years.

On March 16, 2006, Boney filed a motion to correct error along with an affidavit from a concerned citizen, which stated that Juror 118 had discussed the case with him. The trial court had dismissed the juror prior to deliberations after the trial court had received a telephone call from an indi-

vidual on the tenth day of trial claiming that Juror 118 had commented that the jury would be "lynching ... a j*g." Tr. p. 3159, 3164.

Boney's affidavit indicated that juror 118 told the affiant that he would make sure that "the ni* *er hangs from the highest tree." *Id.* at 601, 612. Boney also alleged in his motion that Juror 118 had lied on the jury questionnaire when he acknowledged that Boney should be entitled to a fair trial. Juror 118 also indicated in the questionnaire that he did not have racist attitudes, and that he was not inclined either way to believe that Boney was guilty or not guilty. As a result of these purported lies and the statement that Juror 118 made to the citizen about the trial, Boney claimed that he was entitled to a new trial.

In response, the State submitted affidavits from eleven jurors who stated that they knew Juror 118 and that he had never made any racist statements about Boney in their presence. All of the jurors attested that their decision in finding Boney guilty was based solely on the evidence presented at trial, and that they were not influenced by any remarks that Juror 118 may or may not have made during the trial. Moreover, the jurors pointed out that because Juror 118 had been removed from the panel before deliberations began, he did not have any influence on their decision. The trial court summarily denied the motion to correct error, and Boney now appeals.

## DISCUSSION AND DECISION

### I. Peremptory Challenge

Boney argues that he is entitled to a new trial because the State improperly used a peremptory challenge to strike the sole prospective African American juror on the panel. Specifically, Boney maintains that the trial court's decision to sustain the State's peremptory challenge was clearly erroneous because the State's purported reasons for the challenge were pretextual and not race neutral.

In resolving this issue, we initially observe that great deference is accorded to the trial court in matters relating to the exclusion of jurors. *McCants v. State*, 686 N.E.2d 1281, 1284 (Ind.1997). We will reverse only if we conclude that the trial court's decision was clearly erroneous. *Id.* However, it has been determined that a defendant is denied equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution when he is tried before a jury from which prospective jurors have been purposefully excluded based on their race. *Batson v. Kentucky*, 476 U.S. 79, 86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, a party cannot use a peremptory challenge to strike a prospective juror solely because of the juror's race. *Patterson v. State*, 729 N.E.2d 1035, 1038–39 (Ind.Ct.App.2000) (citing *Batson*, 476 U.S. at 89, 106 S.Ct. 1712). When a party raises a *Batson* challenge, the trial court must undertake a three-step test. " 'First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.' " *Schumm v. State*, 866 N.E.2d 781, 789 (Ind.Ct.App.2007), *reh'g granted* on other grounds (quoting *Highler v. State*, 854 N.E.2d 823, 826 (Ind.2006)). "Second, 'the burden shifts to the State to present a race-neutral explanation for striking the juror.' " *Schumm*, 866 N.E.2d at 789 (quoting *Highler*, 854 N.E.2d at 827). "Third, the trial court must evaluate 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate

burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " *Id.* (quoting *Highler*, 854 N.E.2d at 828). Moreover, to establish a prima facie case of racial discrimination in the process of jury selection, a defendant must show that (1) the excused juror is a member of a cognizable racial group; (2) the prosecutor excused the jurors on account of their race; and (3) the facts and circumstances of the case raise an inference that the exclusion was based on race. *McCants*, 686 N.E.2d at 1284.

██ We note that a variety of race-neutral explanations for striking members from jury panels have been upheld. With regard to a peremptory challenge, the State's reason for striking a juror from the panel need not rise to the level of justifying a challenge for cause or even be particularly persuasive. *Graham v. State*, 738 N.E.2d 1096, 1099 (Ind.Ct.App.2000). The reason "must only be related to the case and constitute a valid race-neutral reason for striking the juror in question." *See Brown v. State*, 751 N.E.2d 664, 668–69 (Ind.2001) (approving the State's decision to strike an African American juror whose niece had been killed by her grand-nephew, reasoning that witness might have been equally biased against both parties); *Harrington v. State*, 755 N.E.2d 1176, 1180 (Ind.Ct.App.2001) (finding no clear error where the State struck an African American teacher from the panel because the prosecutor did not like science teachers).

██ In this case, the prosecutor explained that its reason for striking prospective Juror 16 was based on four responses to the juror questionnaire. As noted above, Juror 16 believed that Boney could not be guilty because Camm had set him up. Tr. p. 641–42. The trial court found that there were several other African Americans remaining on the panel,

denied Boney's motion for a mistrial, and sustained the State's peremptory challenge.

Although Boney contends that the State's answer in moving to strike the juror was pretextual because the State did not move to strike another prospective juror for similar reasons, Boney failed to raise a *Batson* challenge with respect to the other juror. As a result, Boney's claim is waived. *See Lyons v. State*, 600 N.E.2d 560, 565 (Ind.Ct.App.1992) (finding waiver where a defendant failed to object at trial).

Waiver notwithstanding, we note that Boney relies on our Supreme Court's opinion in *Highler*, 854 N.E.2d at 823, where a *Batson* challenge was reviewed with regard to the juror's religious beliefs or occupation. Without citation to authority, the *Highler* court commented that "where the same opinion is expressed by others, but only a minority juror is struck, pretext may be inferred." *Id.* In *Batson*, the United States Supreme Court reasoned:

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712.

In examining the language in *Batson* set forth above, and our Supreme Court's

opinion in *Highler*, it is apparent to us that the *trial court* is in the best position to infer whether or not there is a pretextual reason for the strike. In our view, these cases do not stand for the proposition that a *reviewing court* may infer a pretextual reason. Moreover, *Batson* provides that there may, indeed, be relevant circumstances that might explain why the State did not exercise a peremptory strike of a subsequent juror.

In this case, there was no pattern of strikes against African American jurors. Moreover, the trial court specifically informed the State that it would examine future challenges to prospective African American juror in a careful manner. Tr. p. 645. The prosecutor also informed the trial court that it had not sorted the questionnaires by race and that the State routinely had African Americans sit on juries in Floyd County. *Id.* at 644–45.

In our view, the trial court was in the best position to determine whether the State's reason at the time of the challenge was proper. Under these circumstances, it is apparent that the State's explanation for striking the juror revealed a valid, permissible reason related to the case that was not pretextual or relevant to the juror's race. Thus, we conclude that the trial court's denial of Boney's *Batson* challenge was not clearly erroneous.

## II. Boney's Statements

Boney argues that the trial court erred in admitting several pretrial statements that he made to police officers into evidence because he had invoked his right to counsel before making the statements. In essence, Boney contends that the evidence failed to show that he waived his right to counsel before making the statements.

■ In resolving this issue, we initially observe that the trial court has broad discretion in ruling on the admissibility of evidence. *Washington v. State*, 784 N.E.2d 584, 587 (Ind.Ct.App.2003). Therefore, we will not reverse the trial court's decision to admit Boney's statements absent an abuse of discretion. *Ringo v. State*, 736 N.E.2d 1209, 1211 (Ind. 2000). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Washington*, 784 N.E.2d at 587.

■ To safeguard a defendant's Fifth Amendment right against self-incrimination during custodial interrogation, the United States Supreme Court requires the police to inform persons subjected to custodial interrogation of their right to remain silent and their right to the assistance of counsel during the interrogation.[5] *McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). If a defendant requests the assistance of counsel, the police may not interrogate further until counsel is present unless the accused himself initiates further communication or conversation with the police by evincing a desire or willingness for a generalized discussion about the investigation. *Oregon v. Bradshaw*, 462 U.S. 1039, 1043–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In other words, even when a person is represented by counsel, he can still waive his Fifth Amendment rights and talk to police. *Gilliam v. State*, 650 N.E.2d 45, 50 (Ind.Ct.App.1995). The decision of whether to speak to police rests solely with the defendant. *Ajabu v. State*, 693 N.E.2d 921, 930–31 (Ind.1998). That is, an attorney cannot prevent his client from speak-

---

**5.** Boney does not assert any independent claim that the trial court's admission of his statements violated the Indiana Constitution.

ing to police; he can only advise him as to the wisdom of doing so. *Id.* at 932.

A defendant may waive his rights to silence and to counsel after being advised of those rights, but if the defendant invokes his rights, the questioning must cease. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602. It is the State's burden to prove the voluntariness of the waiver of a defendant's *Miranda* rights and the voluntariness of a confession by a preponderance of the evidence. *Sauerheber v. State,* 698 N.E.2d 796, 803 (Ind.1998). If a waiver cannot be shown, no evidence obtained as a result of the subsequent questioning will be admissible. *Porter v. State,* 743 N.E.2d 1260, 1265 (Ind.Ct.App.2001).

In this case, Boney spoke to police officers on February 17–18, March 4, and March 7, 2005. Tr. p.1948, 2038–39, 2155–58. Boney initially challenges the statements that he made on March 4 following his request for counsel. During that interview, Boney implicated Camm as the shooter. *Id.* at 240–41. When Investigator Kessinger told Boney to "explain it [and] tell me the story," Boney said, "I want an attorney." *Id.* Investigator Kessinger then told Boney to "tell me what happened. I'll get an attorney for you." *Id.* In response, Boney said, "All I know is that David Camm was the shooter," and "that's all I'm gonna say until I get an attorney." *Id.*

Later that day, Boney initiated additional contact with the investigators when he knocked on the interrogation room door. Thereafter, Boney signed a written waiver of rights form and request to make a statement, which were witnessed by Detective Gilbert and Investigator Kessinger.

That form provided in relevant part:

I hereby acknowledge that I at one time requested a lawyer, but now I wish to WAIVE that RIGHT. I further ac-

knowledge that I have INITIATED this interview and that I have REQUESTED to make a statement.

I hereby WAIVE my RIGHTS and state that I do not want a lawyer at this time and that I am willing to make a statement and answer questions.

This WAIVER of my RIGHTS has been KNOWINGLY and VOLUNTARILY made by me without any promises or threats having been made to me and further without any pressure or coercion having been used against me.

States' Ex. 5.

We note that the above waiver form was nearly identical to that which the defendant executed in *Gilliam.* In that case, the defendant reinitiated contact with the police after he informed them that he was not satisfied with his counsel's representation. *Gilliam,* 650 N.E.2d at 50. On appeal, it was determined that Gilliam's statements were not taken in violation of his constitutional rights. *Id.* More specifically, our Supreme Court observed that "Gilliam clearly initiated the communication and his statements were preceded by a knowing and voluntary waiver of his privilege against self-incrimination and his right to have counsel present." *Id.* In light of *Gilliam,* we conclude that the trial court properly admitted Boney's statements after he reinitiated contact with the investigator and detectives on March 4. Thus, the trial court properly determined that Boney's statements were admissible at trial.

With regard to the statements that Boney made on March 7, Sergeant Wilkerson was under the impression that Boney wanted to speak with him after Boney had been arrested. Tr. p. 2264, 2272. As discussed in the facts, Sergeant Wilkerson had spoken to Boney's mother about the case. *Id.* It was determined

that Boney and Sergeant Wilkerson were distantly related by marriage, and Sergeant Wilkerson believed that his connection to the Boney family, and the fact that he is also an African American male might have helped the course of the investigation.

When Sergeant Wilkerson arrived, Boney was again informed of the *Miranda* warnings and he signed a waiver of the right to counsel that was identical to the one that he had previously executed. More specifically, the form indicated that Boney had previously requested an attorney, but that he now wanted to speak to police. During the interview, Boney seemed to want to "open up" to Sergeant Wilkerson and discuss the incident. Tr. p. 2273. However, nearly forty minutes into the interview, Boney's story changed and he informed Sergeant Wilkerson that he was present during the shootings. After the interview, Detective Gilbert and Investigator Kessinger spoke to Boney. Prior to talking to Boney, they did not readvise him of his *Miranda* rights. Boney agrees, however, that if the statements he made to Sergeant Wilkerson were admissible, the statements that he made to the detectives were also admissible. Appellant's Br. p. 29.

We note that in *Bivins v. State*, 642 N.E.2d 928, 937–38 (Ind.1994), the defendant made several statements to police officers over the course of several weeks. Our Supreme Court considered each statement individually, one of which included a waiver of rights form that was similar to the one in the instant case where Bivins had previously requested an attorney. *Id.* at 941. It was determined that the statements were admissible. *Id.* Therefore, in light of the pronouncement in *Bivins*, it is apparent that the trial court did not err in admitting the statements that Boney made

to the police on March 7. Thus, there was no error.

### III. Mistrial

Boney maintains that the trial court should have granted his motion for a mistrial. Specifically, Boney argues that the testimony of two State's witnesses indicating that Boney had been previously incarcerated "was so prejudicial and inflammatory that the damage could not be undone." Appellant's Br. p. 18.

The decision to grant or deny a motion for a mistrial lies within the trial court's discretion. *Pierce v. State*, 761 N.E.2d 821, 825 (Ind.2002). A mistrial is an extreme remedy that is granted only when no other method can rectify the situation. *Heavrin v. State*, 675 N.E.2d 1075, 1083 (Ind.1996). Additionally, the trial court is in the best position to evaluate the circumstances and determine the impact on the jury. *Lehman v. State*, 777 N.E.2d 69, 72 (Ind.Ct.App.2002). To succeed on appeal after the denial of a mistrial, the defendant must show that the conduct complained of was so prejudicial that it had a probable persuasive effect on the jury's decision. *Jackson v. State*, 728 N.E.2d 147, 151 (Ind.2000). Finally, we note that reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings. *Warren v. State*, 757 N.E.2d 995, 999 (Ind.2001).

In this case, Boney contends that the trial court should have granted his motion for a mistrial when two witnesses commented during their testimony that Boney had been previously incarcerated. As noted in the facts, Karen Ancil testified that when she saw Boney several days after the shootings, it was the first time that she had seen him "outside of incarceration." Tr. p. 2672. After Boney moved for a mistrial because of Ancil's statement,

the trial court instructed the jury "to ignore and not consider in any way the witness's statement about Mr. Boney's prior incarceration. That's not relevant to this matter and I'm instructing you to ignore it." *Id.* at 2673–74. Boney then renewed his motion for a mistrial, which the trial court denied. *Id.* at 2677.

Thereafter, prison inmate Richard Cole testified for the State. During the course of direct examination, Cole stated that he was nervous about testifying against someone that was accused of murder. When the prosecutor asked Cole if Boney talked to him about the murders, Cole stated, *"We was in the block* watching the news and everything and sitting in front of the t.v. and talking about the case." *Id.* at 2895 (emphasis added). When Boney moved for a mistrial, the trial court determined that the jury could have interpreted the word "block" in various ways. Hence, Boney's motion for a mistrial was denied. Thereafter, Cole testified that he knew Boney's nickname because he "was in prison with him." *Id.* at 2901. Again, the trial court denied Boney's motion for a mistrial because it did not want to draw more attention to the fact of Boney's previous incarceration. *Id.* at 2916. As a result of Cole's remarks, the State agreed to strike the statements and Cole as a State's witness. *Id.* at 2926. The trial court ordered the same and denied Boney's motion for a mistrial.

In examining the circumstances here, it is apparent that the trial court's admonishments to the jury to disregard the statements and its decision to strike Cole as a witness sufficiently cured any harm that may have resulted from Ancil or Cole's improper testimony.

■ Additionally, even though the term "incarceration" should not have been mentioned, the circumstances here are subject to a harmless error analysis. In-

deed, as our Supreme Court observed in *James v. State,* 613 N.E.2d 15, 22 (Ind. 1993), "where a jury's verdict is supported by independent evidence of guilt such that we are satisfied that there was no substantial likelihood that the evidence in question played a part in the defendant's conviction, any error in admission of prior criminal history may be harmless."

■ Boney admitted that he sold the gun to Camm, and he was at the scene the night of the murders. Boney's fingerprints were recovered from the Bronco, and his sweatshirt was recovered from the scene with his DNA on it. On the night of the murder, Boney purportedly went to "help a buddy." Sometime after the murders, Boney returned home carrying a handgun with a scrape on his knee. Boney also told another individual that he had "three bodies" on his mind. Even more telling, Boney's story that he gave the gun wrapped in his sweatshirt to Camm on the day of the murders could not have been true based on the fact that carpet fibers from a bedroom in Camm's residence were recovered from the sweatshirt, indicating that Boney gave Camm the gun prior to the day that the murders were committed. As a result, it is apparent that Boney's presence at the scene was not to deliver the gun or to be paid for the weapon. Rather, the evidence supported a conclusion beyond a reasonable doubt that Boney was present to aid in committing the murders. Therefore, we conclude that any error that might have occurred with respect to the admission of Ancil's statement or Cole's testimony, which was eventually stricken from the record, was harmless in light of the substantial amount of evidence demonstrating Boney's guilt. Thus, the trial court did not commit reversible error in denying Boney's motions for a mistrial.

## IV. Instruction

Boney contends that the trial court erred in refusing to give Boney's tendered instruction regarding accomplice liability. In particular, Boney argues that the trial court's refusal to give his tendered instruction was erroneous because the final instruction did not include a requirement that the jury had to find that Boney gave the gun to Camm knowing that Camm intended to kill the victims. As a result, Boney claims that he was denied due process of law "because the jury was not instructed on all essential elements of the charged offense." Appellant's Br. p. 25.

The manner of instructing a jury lies largely within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of that discretion. *Powell v. State*, 769 N.E.2d 1128, 1132 (Ind.2002). In reviewing a challenge to a jury instruction, we consider: (1) whether the instruction is a correct statement of the law; (2) whether there was evidence in the record to support giving the instruction; and (3) whether the substance of the instruction is covered by other instructions given by the court. *Hubbard v. State*, 742 N.E.2d 919, 921 (Ind.2001).

The jury must be instructed that accomplice liability requires proof that the defendant engaged in voluntary conduct in concert with his accomplice. *Carter v. State*, 766 N.E.2d 377, 383 (Ind. 2002). Moreover, an accomplice liability instruction that "draws the focus of the jury away from the total circumstances showing that defendant's knowledge and conduct" is improper. *Peterson v. State*, 699 N.E.2d 701, 706 (Ind.Ct.App.1998).

Boney argues that the trial court erred in refusing to give the following tendered instruction:

[T]he State must prove each of the following elements beyond a reasonable doubt: 1. The Defendant 2. knowingly or intentionally 3. Aided David Camm to commit the offense of murder as defined: a. knowingly or intentionally b. killing c. Kim Camm, Brad Camm, and/or Jill Camm with the intent or knowledge that the weapon would be used to commit the murder of Kim Camm, Brad Camm and/or Jill Camm. If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of aiding murder as charged in Count 4.

Tr. p. 3140–41. After determining that it would not give the above instruction, the trial court instructed the jury as follows:

### FINAL INSTRUCTION NO. 16

Aiding an Offense is defined by law as follows: Indiana Code 35–41–2–4.

A person who knowingly or intentionally aids another person in committing Murder is guilty of Murder even though he does not personally participate in each act constituting the Murder.

A person may be convicted of Murder by aiding another to commit Murder even if the other person has not been prosecuted for Murder or has not been convicted of Murder or has been acquitted of Murder.

In order to commit Murder by aiding another to commit Murder, a person must have knowledge that he is aiding the commission of the Murder. To be guilty, he does not have to personally participate in the crime nor does he have to be present when the crime is committed. Merely being present at the scene of the crime is not sufficient to prove that he aided the crime.

Failure to oppose the commission of the crime is also insufficient to prove aiding another to commit the crime. But pres-

ence at the scene of the crime or failure to oppose the crime's commission are factors which may be considered in determining whether there was aiding another to commit the crime.

Before you may convict the Defendant, the State must have proved each of the following elements beyond a reasonable doubt:

1. The Defendant
2. knowingly or intentionally
3. aided
4. David R. Camm to knowingly or intentionally commit the offense of Murder, to-wit: by Killing Kimberly S. Camm, Bradley R. Camm and/or Jill C. Camm.
5. by providing David R. Camm with the weapon used to kill Kimberly S. Camm, Bradley R. Camm and/or Jill C. Camm.

With respect to each Count, if the State fails to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of Murder, a felony, charged in that Count.

Appellant's App. p. 530–31. The jury was also instructed on the statutory definition of murder, and it was further instructed that: "If the State fails to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of Murder, a felony, charged in that Count." *Id.* at 529.

Notwithstanding the above, Boney claims that the trial court erred in refusing to give his tendered instruction because the final instruction as given did not instruct the jury that it must find that Boney provided the weapon to Camm "with the knowledge or intent the weapon would be used to kill [the Camms]" to find him guilty. Appellant's Br. p. 24. In other words, Boney claimed that the deficiency of the instruction that the trial court gave

"was that the jury did not have to find Boney had the mens rea to commit murder when he provided a handgun to David Camm," and "that it was only required to find that he knowingly or intentionally aided Camm in committing the murder(s) by providing him with the weapon used." *Id.*

■ We note that the trial court essentially gave the pattern jury instruction on aiding an offense. Tr. p. 3338–39; *see* Ind. Pattern Jury Instruction (Criminal) 2.11 (3rd ed.2006). We acknowledge that pattern jury instructions are not always upheld as correct statements of law. However, the "preferred practice is to use the pattern jury instruction." *Gravens v. State,* 836 N.E.2d 490, 493 (Ind.Ct.App. 2005). Here, the final instruction sufficiently informed the jury as to the requirement of finding affirmative action on the part of the defendant before he can be convicted as an accomplice. The trial court's final instruction repeatedly used the terms "aid" and "participate," which are words that denote affirmative conduct or action. Moreover, the final instruction specifically states that "[i]n order to commit murder by aiding another to commit Murder, a person must have knowledge that he is aiding the commission of murder." Appellant's App. p. 530. Moreover, the trial court's final instruction also states that a person's presence at the scene or his failure to oppose the crime, which are primary examples of passive conduct, are not sufficient in and of themselves, to establish accomplice liability.

In *Hopkins v. State,* 747 N.E.2d 598, 608 (Ind.Ct.App.2001), we upheld similar language used in the trial court's instruction regarding the defendant's knowledge that he is assisting in the commission of a crime. Also, while Boney relies on our Supreme Court's opinion in *Taylor v. State,* 840 N.E.2d 324 (Ind.2006), for the proposition that his tendered instruction

should have been given, we find that argument misplaced. In *Taylor*, the defendant was charged with murder and was convicted as an accomplice to a principal who shot the victim while Taylor was present. On appeal, our Supreme Court discussed the accomplice liability instruction and stated: "If Taylor knowingly or intentionally aided and abetted [principal] Bowling to kill [victim] Anderson, Taylor can be found guilty of murder so long as (1) Bowling killed Anderson and (2) Taylor knew or intended that Anderson would be killed." *Id.* at 336–37. The *Taylor* court further observed that the "specific intent to kill" instruction is limited to attempted murder cases. *Id.* at 337 n. 3. Moreover, the issue presented in *Taylor* concerned the principal's mens rea, not the accomplice's mens rea as in this case. Here, the trial court instructed the jury that Boney could be guilty as an accomplice if he knew that he was aiding Camm to commit murder. Thus, it is apparent that the trial court's final instruction adequately informed the jury that a defendant must have knowledge that he is aiding in the commission of a murder. Tr. p. 3338–40. Thus, reading instruction sixteen in its entirety, along with the other final instructions demonstrates that the trial court properly instructed the jury that it had to find that Boney knew he was aiding Camm in the commission of the murders.

As an aside, we note that the jury was free to disbelieve Boney's contention that he lacked such knowledge. As discussed above, the evidence demonstrated that Boney told Mattingly just prior to the murders that he was going to "help a buddy." *Id.* at 2845–46. When Boney returned later that evening after the murders, Singh noticed that his knee was scraped and he showed Mattingly a gun. The evidence revealed that Kim Camm had struggled with her murderer. *Id.* at 2350. Boney also told Edwards, his fiancée, that he

knew that Camm was going to use the gun to kill the victims. *Id.* at 3181–82. Moreover, during an argument over a television set with Carl Colvin, Boney indicated that he had "three bodies" on his mind and that "one more" was not going to matter. *Id.* at 2287.

In light of this evidence, the jury could have disregarded Boney's version that he went to the Camm residence on the night of the murders unaware that Camm was going to kill his family. Indeed, the evidence established that Camm already had the gun in his bedroom before the night of the murders based on carpet fibers that were recovered and gun oil that was found on the sweatshirt. The evidence also supported the conclusion that Boney gave the gun to Camm to kill his children based on Jill's blood spatter and tissue matter that was recovered from Camm's t-shirt. Thus, there was ample evidence for the jury to conclude that Boney aided Camm in the commission of the murders.

In conclusion, the final instruction was a correct statement of the law and adequately informed the jury that Boney knew that Camm intended to kill his family with the gun that Boney had sold to him. As a result, the trial court properly instructed the jury as to the State's theory that Boney aided Camm in the commission of the murders, or in fact committed the murders himself. Therefore, the trial court properly rejected Boney's tendered instruction.

### V. Juror Misconduct

Finally, Boney contends that the trial court erred in denying his motion to correct error and his request for a new trial because of alleged juror misconduct. Specifically, Boney argues that although one of the jurors was dismissed prior to deliberations and he denied that he was racially biased or prejudiced in the juror questionnaire, the evidence established that the

juror had made racial remarks about Boney to other individuals during the course of the trial.

■ In resolving this issue, we initially observe that Indiana Criminal Rule 16 permits a defendant to file a motion to correct error within thirty days of final judgment. Additionally, "a defendant seeking a new trial because of juror misconduct must show that the misconduct (1) was gross and (2) probably harmed the defendant." *Griffin v. State*, 754 N.E.2d 899, 901 (Ind.2001). We review the trial court's ruling with respect to juror misconduct for an abuse of discretion. *Id.*

■ As discussed above, the trial court received a telephone call from a concerned citizen on the tenth day of trial. The caller indicated that juror 118 had made comments that "[the jury] would be lynching us a j*g." Tr. p. 3159, 3164. Although the juror denied making such statements, the trial court conducted a hearing and excused Juror 118 "in the interests of a fair trial." *Id.* at 3165–67.

Following the verdict, Boney submitted the affidavit of another citizen who claimed that Juror 118 made comments to him about serving on the jury. Specifically, the affiant alleged that Juror 118 told him that "it's not like it matters. As long as I'm on the jury I'm gonna make sure the ni* *er hangs from the highest tree."[6] In response, the State submitted affidavits of eleven jurors, which stated that:

3. There was [sic] never any statements made in my presence by juror 118 concerning Racism or Bias involving the Defendant Charles B. Boney.

4. I was not influenced by juror 118 in any way, shape, or form.

5. My verdict was based on the evidence submitted and witnesses that testified during the trial.

Appellant's App. p. 641. The trial court summarily denied Boney's motion to correct error. *Id.* at 29–30.

Although Boney readily acknowledges that Juror 118 had been excused prior to deliberations, he claims that he was entitled to a new trial because our jury rules permit jurors to discuss the evidence before deliberations. As a result, Boney argues that Juror 118's "mere presence probably harmed him." Appellant's Br. p. 51.

Indiana Jury Rule 20(8) provides that
[j]urors are permitted to discuss the evidence among themselves in the jury room during recesses from trial when all are present, as long as they reserve judgment about the outcome of the case until deliberations commence. The court shall admonish jurors not to discuss the case with anyone other than fellow jurors during the trial.

Boney concedes that the jury is presumed to follow the trial court's instructions, which included an instruction that the jurors could discuss the evidence, but they must reserve judgment until deliberation commenced. Appellant's Br. p. 52. As noted above, Juror 118 was removed prior to deliberations, and there is no showing that his presence on the jury prior to that time influenced the other jurors and prejudiced Boney. Moreover, the evidence shows that none of the other jurors heard Juror 118 utter any racist or biased comments during the trial. Also, because Juror 118 did not participate in deliberations,

---

**6.** In its candor to this tribunal, the State points out that it "abhors such statements and does not condone hate speech under any circumstances." Appellee's Br. p. 35 n. 5. The State goes on to note that it nonetheless "is bound to defend the trial court's ruling, not the content of the statements allegedly made by [the juror]." *Id.*

Boney cannot show that the juror's silence during voir dire harmed him because he has not shown that the juror influenced the others in any way.

Finally, we note that Boney's reliance on our Supreme Court's opinion in *State v. Dye*, 784 N.E.2d 469 (Ind.2003), is misplaced. Specifically, unlike a juror in *Dye* who lied during voir dire and remained on the panel, Juror 118 was removed and did not participate in deliberations. Tr. p. 3156–71. For these reasons, Boney's claim fails.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and ROBB, J., concur.

