Pursuant to Ind.Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before any
court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT:

**MATTHEW G. GRANTHAM**
Bowers, Brewer, Garrett & Wiley, LLP
Huntington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

CODY R. HUNT,                         )
                                      )
    Appellant-Defendant,             )
                                      )
        vs.                    )        No. 35A05-1112-CR-677
                                      )
STATE OF INDIANA,                     )
                                      )
    Appellee-Plaintiff.              )

APPEAL FROM THE HUNTINGTON CIRCUIT COURT
The Honorable Thomas M. Hakes, Judge
Cause No. 35C01-1102-FD-26

**August 21, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Cody R. Hunt appeals his conviction of Battery of a Child Less Than Fourteen Years of Age by Someone Older than Eighteen[1] as a class D felony, presenting the following restated issue for review: Did the trial court err in refusing to instruct the jury that Hunt had legal authority *in loco parentis* to punish his girlfriend's child?

We affirm.

The facts favorable to the conviction are that in early 2011, Hunt had been dating Michelle Reynolds for about four and one-half months. Reynolds lived with her three children. J.M., the middle child, was almost two years old. Reynolds would discipline her children by smacking their hands, placing them on a time-out bench, or spanking them. She described the way she spanked her children as "a tap, … not a full force swing and not a hitting, punching, nothing." *Transcript* at 405. Hunt did not live with Reynolds, but he spent the night perhaps as often as every other night. Hunt would occasionally watch the children. Reynolds had given Hunt permission to correct the children's behavior and even to spank them, but to do so in the same "tapping" manner that she did. On one occasion, Hunt spanked B.M. in what Reynolds considered an excessive manner and she ordered him to "lay off my son." *Id*. at 408.

On the morning of January 31, 2011, Reynolds dropped off her children at a daycare center, after which she and Hunt went shopping. After several hours, Reynolds went to work. Hunt picked up the children from daycare at approximately 5 p.m. Later, while she was still at work, Reynolds received a text from Hunt that J.M. "was being a f'ing brat." *Id*. at 217. Hunt picked up Reynolds from work at approximately 10:15 p.m. When Reynolds

[1] Ind. Code Ann. § 35-42-2-1(a)(2)(B) (West, Westlaw current with all 2012 legislation).

got into the car, she noted that Hunt "had looked in the rearview mirror and was staring at [J.M.] telling her not to look at him, that she was being an f'ing brat and she would not listen." *Id*. at 218. They went back to Reynolds's house, put the children to bed, and retired for the evening. The next morning, after getting the children ready, Reynolds asked Hunt to return her debit card to her. Hunt "started screaming and smacked [Reynolds] in the face" while she was holding her baby. *Id*. at 224. Reynolds took her debit card and left with her children to drive to the home of Lisa Hamilton, her children's paternal grandmother, who had agreed to watch the children that day. Reynolds told Hamilton what had transpired that morning, including the fact that Hunt had smacked her. While Reynolds was working that evening, Hunt sent her a text asking why she would not let him watch her children when she was working.

While she was babysitting the children, Hamilton changed J.M.'s diaper. She noticed a purple, handprint-shaped bruise on J.M.'s backside. She telephoned her daughter, Angel Cook, who went to Hamilton's residence and viewed J.M.'s bruise. Cook telephoned Reynolds and told her she needed to come to Hamilton's residence because she had found a bruise on J.M.

On her way to Hamilton's residence, Reynolds text-messaged Hunt at approximately 4:31 p.m. and asked "What did [J.M.] do last night? Y did u whoop her butt". *Exhibit Binder*, State's Exhibit 3 (Exhibit 3).[2] Hunt responded almost immediately via text-message: "Wut?" and then, "Excuse me why you ask that". *Id*. Hunt then sent another text to

---

[2] The text messages transcribed in this opinion are accurately reproduced. We will not bother with flagging all of the grammatical and spelling errors in the original.

Reynolds, this one stating, "She bit me are you on drugs you forget I told you last night dont text me thanks bitch". *Id*. When Reynolds arrived at Hamilton's home, she examined J.M. and observed a "massive" handprint-shaped bruise covering J.M.'s hip "and in to her butt area". *Id*. at 240. Reynolds and Hamilton took J.M. to the hospital.

Thereafter, Hunt sent several text-messages to Reynolds, including the following: (1) "You have me crying i love your kids it was to teach her to listen not hurt her you say i can whoop her butt but my bro told me you hit [A.H.][3] in the back the head why you beat my child im going to police station"; Exhibit 3. (2) "Nick my witness dont be stupid"; *id*.; and (3) "Where are you at police officer need to speak wit you". *Id*. At 4:51 p.m., Hunt called Reynolds and left the following voicemail: "Hey yo bitch, you need to call me. I don't know what's going on but uh, you're really pissing me off because I whooped her ass because she bit me and if there's a bruise it's not from me whooping her ass, she had a diaper on, think about it". *Transcript* at 252.

At the Parkview Huntington Hospital Emergency Room, Dr. David Reid examined J.M. and observed a "hand shaped bruise on her left hip". *Id*. at 184. The bruise appeared to be fresh, which typically means it occurred within the preceding twenty-four hours. Hospital staff called the Huntington Sheriff's Department and reported the situation. Officer David Jackson was dispatched to the hospital. Upon arriving, he took pictures of J.M.'s bruise and interviewed Reynolds, who informed him that she believed Hunt was responsible for the injury. She related to the officer the relevant details of the preceding day's events and played for him the above-described voicemail. Officer Jackson contacted Huntington Department of

4

Child Services (HDCS) family case manager Shane Blair, who drove to the hospital and viewed J.M.'s injury. Both Officer Jackson and Blair were of the opinion that the bruise was in the shape of a hand.

While all of this was occurring, Hunt went to the residence of Erin Berg, who was dating a friend of Hunt's, Nicholas Tingle. Hunt informed Berg that Reynolds accused him of beating J.M. Sometime later, Hunt offered to pay Berg and Tingle in exchange for testimony exonerating him of the charges relating to J.M.'s injury. Approximately one month later, Hunt went to Berg's residence looking for Tingle and threatening to "whoop his ass" because Tingle's statement to the police did not exculpate Hunt. *Id*. at 294. On February 4, 2011, Huntington Police Department Detective Cory Boxell interviewed Hunt. At first, Hunt claimed Reynolds was lying about the incident, but he later admitted that he struck J.M. He claimed that it was because "all that day, she wasn't listening". *Id*. at 368. This contravened his assertion on the voicemail he left to Reynolds that he struck J.M. because she bit him.

Following the interview, Hunt was placed under arrest and charged with battery of a child as a class D felony. At trial, he requested a jury instruction to the effect that he had authority *in loco parentis* to discipline Reynolds's children. The trial court refused to give the jury instruction because "the defendant did not act as a father figure but as a babysitter", *id*. at 430, and "a parent's responsibility is different from a boyfriend's". *Id*. at 431. Following a jury trial, Hunt was found guilty as charged.

Hunt contends the trial court erred in refusing to read the following instructions to the

---

[3] A.H. was Hunt's child by another woman.

jury:

## DEFENDANT'S TENDERED INSTRUCTION NUMBER 1

A person may not be convicted for engaging in conduct that would otherwise be a crime if he had the legal authority to do so.

It is an issue in this case whether the accused had legal authority to discipline [J.M.]. Under Indiana Law, a person is authorized to discipline a child over whom he had the responsibilities of a father or stepfather when that discipline would otherwise constitute the crime of battery.

The State has the burden of proving beyond a reasonable doubt that the accused did not have legal authority.

\* \* \* \* \*

*Appellant's Appendix* at 39.

## DEFENDANT'S TENDERED INSTRUCTION NUMBER 2

[It is a d]efense to the charge of Battery on a Child that the Defendant was in the place of a parent of [J.M.] and the Defendant's alleged conduct was the use of Defendant upon [J.M.] of reasonable force which Defendant reasonably believed to be necessary for [J.M.'s] proper control, training, or education.

In determining whether Defendant's conduct was such reasonable discipline, you may consider:

1. Whether the Defendant was authorized to exercise parental authority over [J.M.].

\* \* \* \* \*

*Id*. at 40.

Our standard of reviewing challenges to decisions concerning jury instructions is well settled.

The manner of instructing a jury lies largely within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of that discretion. In reviewing a challenge to a jury instruction, we consider: (1)

6

whether the instruction is a correct statement of the law; (2) whether there was evidence in the record to support giving the instruction; and (3) whether the substance of the instruction is covered by other instructions given by the court.

*Boney v. State,* 880 N.E.2d 279, 293 (Ind. Ct. App. 2008) (citations omitted), *trans. denied.*

In order to convict Hunt of battery as a class D felony under I.C. § 35-42-2-1(a)(2)(B), the State was required to prove beyond a reasonable doubt that he knowingly or intentionally touched another person less than fourteen years old in a rude, insolent, or angry manner. Even assuming he struck J.M. as alleged, however, Hunt contends there is a defense available to him that absolves him of criminal liability, i.e.: "[a] person is justified in engaging in conduct otherwise prohibited if he has legal authority to do so." Ind. Code Ann. § 35–41–3–1 (West, Westlaw current with all 2012 legislation). "This statute has been interpreted to provide legal authority for a parent to engage in reasonable discipline of her child, even if such conduct would otherwise constitute battery." *McReynolds v. State*, 901 N.E.2d 1149, 1152 (Ind. Ct. App. 2009) (quoting *State v. Fettig,* 884 N.E.2d 341, 345 (Ind. Ct. App. 2008)). The defense of parental privilege, like self-defense, is a complete defense to battery of a child. *Willis v. State,* 888 N.E.2d 177 (Ind. 2008). As our Supreme Court has explained: "[a] parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his [or her] child as he [or she] reasonably believes to be necessary for its proper control, training, or education." *Id.* at 182 (quoting Restatement of the Law (Second) Torts, § 147(1) (1965)).

"[T]o sustain a conviction for battery where a claim of parental privilege has been asserted, the State must prove that either: (1) the force the parent used was unreasonable or (2) the parent's belief that such force was necessary to control her child and prevent

7

misconduct was unreasonable." *Id.* "The State may refute a claim of the defense of parental privilege by direct rebuttal or by relying upon the sufficiency of the evidence in its case-in-chief." *Id.* In essence, Hunt contends that the evidence was insufficient to rebut the parental privilege defense.

> The standard of review for a challenge to the sufficiency of the evidence to rebut a claim of parental privilege as a defense to battery on a child is the same as the standard for any sufficiency claim: the appellate court neither reweighs the evidence nor judges the credibility of witnesses, and if there is sufficient evidence of probative value to support the conclusion of the trier of fact, the verdict will not be disturbed.

*Id.* at 182–83 (citations omitted).

Was Hunt entitled to assert the parental privilege defense? This question was addressed by this court under similar circumstances in *McReynolds*. In that case, the defendant lived in a woman's home in exchange for babysitting her children while she was at work. He also transported the children to and from school and helped them with their homework. One day, the defendant beat one of the children with a belt and a wooden clothes hanger, ostensibly for lying. The defendant was subsequently charged with battery of a child under I.C. § 35-42-2-1(a)(2)(B). At trial, he asserted the defense of parental privilege under I.C. § 35-41-3-1. As in the present case, the State asserted in *McReynolds* that the parental privilege defense was not available to the defendant in that case on grounds that he was not a parent. This court considered for the first time the question of whether a caregiver such as the *McReynolds* defendant could avail himself of the parental privilege defense.

We acknowledged that the defense could be applied in limited circumstances to non-parents, including school authorities, *see Barocas v. State,* 949 N.E.2d 1256 (Ind. Ct. App.

8

2011) and to those "who are persons in loco parentis." *McReynolds v. State*, 901 N.E.2d at 1153. The determination of whether a person is entitled to such status is not susceptible to bright-line rules. It seems to us that as specific a description as is possible may be extrapolated from the following analysis of the *McReynolds* defendant's claim:

> [Defendant] was neither a stepparent nor romantically involved with [the victim]'s mother. He did not act as a father figure, nor did he have the responsibilities of a father or stepfather. He did not make parenting decisions on his own or even in conjunction with [the victim's mother]. [Defendant] acknowledged that he "didn't really ask questions" about [the mother]'s parental decisions. In short, [Defendant] was a babysitter. He drove the children to school and helped them with their homework. When necessary, he asked Wasson's permission to discipline the children, although he did not do so on this occasion. At all times, [Defendant] was subject to [the mother]'s direction. Given the circumstances present here, we conclude that [Defendant] was not a person in loco parentis, and therefore the parental privilege defense is not available to him.

*Id.* at 1154. From this, it would appear that the viability of a defendant's claim depends upon his or her placement on a continuum whose extremes are a parent at one end and a babysitter at the other.

In the present case, by Hunt's own admission, he did not live with Reynolds and her children. Although he did occasionally watch the children, he was not primarily charged with that responsibility. The evidence revealed that both sets of the children's grandparents, as well as Reynolds's sister, also babysat the children when Reynolds required assistance in that respect. Moreover, it is significant that, rather than rely upon Hunt to care for her children on a regular basis while she was at work, Reynolds paid to send her children to daycare. Therefore, with respect to his responsibility for the children's care, we think it accurate to characterize Hunt as an occasional babysitter. To the extent that Hunt disciplined

9

the children, the record reflects that it was done with Reynolds's permission and was subject to her instruction and approval. In the final analysis, relative to *McReynolds*, the only fact that is materially different in this case is that Hunt and Reynolds shared a relatively brief romantic relationship that terminated shortly after this incident. We conclude this is not enough to move Hunt's status sufficiently from the "babysitter" end of the continuum to the "parent" end such as to justify classifying Hunt as *in loco parentis* with respect to J.M. Accordingly, he was not entitled to assert the defense set out in I.C. § 35-41-3-1 and the trial court did not err in refusing to instruct the jury to the contrary.

Judgment affirmed.

BROWN, J., and DARDEN, Senior Judge, concur.