Kerrie PRICE, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–0006–CR–385.

Supreme Court of Indiana.

April 10, 2002.

Katherine A. Cornelius, Marion County Public Defender Office, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Adam M. Dulik, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

Appellant Kerrie Price fatally shot two security guards at an apartment in an Indianapolis neighborhood called the Meadows, and his trial eventually led to a sentence of life without parole. We affirm.

## Facts & Procedural History

On the afternoon of February 19, 1997, security guards Robert Black and Bryan Northern heard someone making loud "weird" noises at an apartment complex where they worked on the northeast side of the city. They told the offender to quiet down, but he made the noise again and added an obscenity. The noisemaker and his cousin then ran into an apartment building at 4138 Edgemere Court.

Black and Northern pursued the two young men into the building and began knocking on doors to locate them. The guards asked the occupant of apartment D2 if she had seen anyone wearing a white t-shirt enter the building, but she had not. She heard the guards go next door and knock at William Colquit's apartment.

■ Price, wanted on an outstanding warrant for failure to appear in court on a probation violation charge, was in that apartment. He later told a friend that two security guards knocked on the door, asked whether he lived there, and requested identification. He went to a closet, purportedly to retrieve his identification, but instead grabbed a gun and fired at the guards.[1]

Price hid in a nearby apartment until a friend sneaked him into a car and drove him to another location. In the succeeding days he changed locations three more times, once in the trunk of a car, to evade the police. On February 22nd, a SWAT team forced Price out of hiding with tear gas after a five-hour effort to persuade him to voluntarily release a hostage and surrender. During the standoff Price told a police negotiator that he was not present

---

1. At trial Price claimed that the guards broke into the apartment and fired first, forcing Price to return the fire in self-defense as he fled to the back of the apartment, then out the front door. (R. at 6962–72.) On appeal, however, we do not weigh evidence or judge credibility of witnesses, and we look only to evidence favorable to the judgment. *Hatton v. State*, 626 N.E.2d 442 (Ind.1993).

at the shootings, although he later changed his story and claimed he shot Black and Northern in self-defense.[2]

Black died from multiple gunshot wounds. Northern died after several weeks in the hospital of infection caused by multiple gunshot wounds.

The State charged Price with two counts of murder and sought the death penalty. The jury found Price guilty on both counts and recommended a sentence of life without parole, which the court imposed.

## I. Evidentiary Challenges

 Decisions to admit or exclude evidence are matters for the trial court's discretion. *See Minnick v. State*, 544 N.E.2d 471 (Ind.1989). We afford these decisions great deference on appeal, reversing only when a manifest abuse of discretion denies the defendant a fair trial. *Id.*

*A. The Photographs of Price.* At trial the State introduced two photographs found at the crime scene. Each showed Price at a club with four companions. He was gesturing in a manner that could be interpreted as a gang sign.

The defense argued that the photographs were prejudicial and irrelevant because identification was not an issue. The State acknowledged that the defense was not contesting Price's presence at the shooting, but argued that the photographs were relevant "to show the guilty knowledge of the defendant" by demonstrating

that he had changed his hairstyle and had gold caps removed from his teeth.[3] (R. at 5539–40.)

Defense counsel took responsibility for advising Price to change his appearance "to look proper and dignified here in a court of law, in a death penalty case." (R. at 5540.) Nonetheless, the court admitted the photographs as "minimally relevant," saying, "[O]bviously his looks have dramatically changed. I think it's fair for the . . . jurors on their own to observe what he looked like at that time." (R. at 5541.)

 We agree with Price that the court erred in admitting the photographs. There is no contention here that Price changed his appearance as part of his efforts to evade capture, or to otherwise foil identification before or during trial.

Because identification was not at issue, the photographs were irrelevant. *See* Ind. Evidence Rule 402. Mostly, they seemed designed as character evidence inadmissible under Ind. Evid. R. 404(a) ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: (1) Character of accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same; . . . .").

A defendant does not open the door to otherwise inadmissible character evidence

---

**2.** Price also gave a television interview after his arrest, in which he said, "They know I wasn't there. They know for a fact I wasn't nowhere inside that apartment complex at the time of that shooting. . . . I didn't fire nothing. . . . I don't know what happened that day . . . I wasn't there when the shooting happened. . . . I didn't do nothing." (R. at 6781, State's Exh. 271.) At trial he claimed he lied only because jail personnel had threatened him, although he did not mention these threats during the interview and appeared

quite calm and unhurried on camera. (*Id.*, R. at 7051–53.)

**3.** The State also argued that the photos proved that Price met another witness at this particular club, but the defense pointed out that where the two met was minimally relevant and offered a stipulation. (R. at 5539–40.) The State acknowledged that it did not intend to try to argue or prove gang affiliation. (R. at 5541.)

merely by dressing and grooming in a manner appropriate for court. Tailoring one's appearance to that occasion may indicate consciousness of social stereotypes as easily as consciousness of guilt, because "[f]or unnumbered ages the external appearance has been deemed to be an index to the internal man." Henry Hardwicke, *The Art of Winning Cases or Modern Advocacy* 153 (1894) (quoted in Richard H. Underwood, *Truth Verifiers: From the Hot Iron to the Lie Detector*, 84 Ky. L.J. 597, 622 (1995)).

Photographs showing how a defendant looked at the time of the crime are frequently probative. Here, however, they largely invited jurors to evaluate guilt based on whether the defendant looked like the type of person who would commit this sort of crime. This is what Rule 404(a) prohibits.

■■■ Nevertheless, "[w]e disregard error in the admission of evidence unless it affects the substantial rights of a party." *Willey v. State*, 712 N.E.2d 434, 444 (Ind. 1999) (citing, *inter alia*, Ind. Trial Rule 61). In light of other evidence that Price shot the two security guards multiple times while receiving no injuries himself and later confessed to two friends that he fired first and without provocation, the erroneous admission of the two photographs was harmless.

*B. The Autopsy Photographs.* The State introduced seven photographs from Black's autopsy to illustrate a pathologist's testimony concerning the number and location of Black's gunshot wounds. The defense objected to two photographs that showed wounds caused by surgical procedures performed on Black during lifesaving efforts, and one that showed an autopsy wound to Black's head.

The court allowed all the photographs because each of the seven uniquely illustrated Black's wounds. The pathologist

identified and explained the wounds that resulted from surgical and autopsy procedures.

■■ One of the challenged photographs illustrated, in perspective, a gunshot wound that struck Black in his back. Another illustrated a chest wound Black suffered when "bent forward, if he was on his feet; or . . . already on the ground." (R. at 6701, 6759.) Both were relevant to Price's claim of self-defense.

The defense also objected to all three autopsy photographs of Northern that were offered as evidence, arguing that they were irrelevant because the pathologist could not distinguish bullet entry wounds from surgical wounds. The State countered that the photographs supported the pathologist's testimony that he found possible entry wounds consistent with bullet holes in the shirt Northern was wearing when he was shot and with Northern's internal gunshot injuries. The photographs also showed manifestations of sepsis from gunshot wounds, which the pathologist testified caused Northern's death. The court allowed all three photographs.

Although these photographs were unpleasant, all were unique and relevant to establishing cause of death and the number and nature of wounds the victims suffered. The trial court did not abuse its discretion in concluding that any potential prejudice did not substantially outweigh the photographs' probative value. *See* Evid. R. 403.

*C. Evidence of a Victim's Character.* Price argues that he should have been allowed to attack Black's character by introducing evidence that Black entered into an illicit arrangement with the Rocky Ripple town marshal so that he and employees of his security company could be deputized. (Appellant's Br. at 9–13.) Price also challenges the exclusion of evidence

that on three prior occasions Black "forced his way into apartments when he had no authority." (Appellant's Br. at 12–13.)

Price does not assert that he was aware of this information at the time of the shooting, so he cannot claim that it was relevant to show that he acted in self-defense because he had reason to fear Black. Rather, he argues that repeated references to the victims as "officers" opened the door to evidence of their character, because "[t]he designation of 'police officer' carries with it a belief by most people that the [officer] will be more calm in the face of opposition, relaxed and ready to respond in times of danger, show more integrity and be more truthful." (Appellant's Br. at 9–10.)

He cites no authority to support this argument. He acknowledges that defense counsel read a stipulation to the jury that neither victim had police powers. (Appellant's Br. at 10; R. at 7319.)

Indiana Evidence Rule 404 generally excludes character evidence, but provides an exception for "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused." Evid. R. 404(a)(2). Evidence Rule 405 governs methods of proving character. Rule 405(a) allows direct examination in the form of testimony as to reputation or in the form of an opinion. Inquiry into specific instances of conduct is limited to cross-examination or when character or a trait of character is an essential element of a charge, claim, or defense. Evid. R. 405(a), (b).

In *Brooks v. State,* 683 N.E.2d 574 (Ind. 1997), we discussed how these rules operate in a situation similar to the one at hand. Brooks fatally shot a man after an argument that began at a bar. *Id.* at 575. He sought to introduce testimony that the victim had been charged with two counts of battery three years earlier and convicted on one of the counts. *Id.* at 576. We said:

> Indiana Evidence Rule 405 permits proof of the violent character of the victim by reputation or opinion testimony. In this case, however, Brooks did not seek to introduce reputation or opinion testimony. Instead, he attempted to introduce direct testimony of two specific prior batteries to show [the victim's] violent propensities. Evidence of specific incidents is permissible only on cross-examination of a character witness pursuant to Rule 405(a), or when character 'is an essential element of a charge, claim, or defense' pursuant to Rule 405(b). Neither situation is presented here. In an offer to prove, defense counsel stated that he proposed to call the witness to testify about the incidents, not that he intended to cross-examine a character or opinion witness. Nor was the victim's character an essential element of Brooks' claim of self-defense. Whether or not [the victim] had violent propensities, the jury could still determine that Brooks did not act in self-defense.

*Id.* at 576–77 (citations and footnotes omitted).

■ The same is true here. Price sought to introduce evidence of specific instances of Black's prior conduct to show that Black had violent propensities. The trial court appropriately refused to admit this evidence.[4]

*D. A Witness's Plea Agreement.* Turkessa Guthrie, Price's former girlfriend, helped Price escape from the Meadows on the day of the shootings and

---

4. We note that the defense was allowed to introduce evidence that Black was carrying a gun the day of the shootings although in 1987, after an Indiana State Police administrative hearing, he was deemed "not a proper person to be licensed" to carry a handgun and his license was revoked. (R. at 7190, 7298, 7303, 7386.)

hide from police for the next three days. The State charged Guthrie with assisting a criminal as a class C felony.[5] It reduced the charge to assisting a fugitive from justice, a class A misdemeanor, in return for Guthrie's guilty plea and testimony against Price.

Price argues that "Ms. Guthrie's altered testimony was obtained through illegal conduct by the State in the form of an illegal plea agreement." (Appellant's Br. at 24.) We need not elaborate on the reasoning behind this argument because even if Price is correct, he lacks standing to raise this issue.

In *Bedwell v. State*, 481 N.E.2d 1090, 1092 (Ind.1985), a defendant argued without success that he should be allowed to attack the legality of a suspended sentence offered to a State's witness as part of a plea agreement. We said:

> This is, after all, an appeal of Appellant's convictions and any challenge to the legality of the plea agreement between [the State witness] and the State must be made by [that witness] in his own independent action.... [T]he plea agreement was relevant only with regard to [the witness's] credibility before this jury and its legality would not affect [the witness's] duty to testify truthfully while under oath. Moreover, Appellant was allowed to fully cross-examine [the witness] and had every opportunity to discredit or otherwise challenge [the witness's] credibility.

*Id.*

■ Similarly, here, the circumstances of Guthrie's testimony were fully disclosed.

The jury heard about the plea agreement and a copy of that agreement was entered into evidence. Guthrie testified that she was originally charged with a C felony for assisting Price. Price therefore had a full opportunity to attack Guthrie's credibility, and any challenge to the legality of her plea agreement would be her claim, not his.

■ *E. Other Rule 404 Challenges.* Price raises four additional challenges to evidence he claims was improperly admitted to impeach his character. (Appellant's Br. at 20–23.) He claims error in admitting evidence, first, about the history of the gun used in the shooting and, second, about his flight and ultimate capture. Because he made no objection at trial, he has not preserved these claims for appeal.

Third in this list is a claim involving State witness Dorain Moore, at whose house Price was hiding when he was finally apprehended. At trial Moore claimed to have forgotten his activities the day those events occurred. He contradicted his own deposition testimony by denying that he saw Price when he arrived home the night of the standoff.

The defense stipulated to admission of Moore's deposition and prior statement because "he's come really close to committing perjury ... he's making a mockery of this trial and we want him out of here." (R. at 6160.) The judge then pointed out for the record that Moore greeted Price in the courtroom by saying, "Hey man,

---

**5.** Indiana Code Ann. § 35–44–3–2 (West 1998) says:

> A person not standing in the relation of parent, child, or spouse to another person who has committed a crime or is a fugitive from justice who, with intent to hinder the apprehension or punishment of the other person, harbors, conceals, or otherwise as-

sists the person commits assisting a criminal, a Class A misdemeanor. However, the offense is ...

> (2) a Class C felony if the person assisted has committed murder or a Class A felony, or if the assistance was providing a deadly weapon.

what's up?", which might imply a rapport between the two. (R. at 6160.) The defense asked that Moore not be brought back into the courtroom based on his unpredictable demeanor and behavior, and the court agreed.

The court allowed the State to present evidence that after Moore's testimony, as the jury exited the courtroom, Moore asked Price whether he was "doing all right" and Price nodded in the affirmative, then both men laughed. (R. at 6633.) The court reasoned that the incident was relevant to show Moore's bias.

■ Price now argues that this testimony improperly highlighted irrelevant behavior and "discredit[ed] Mr. Price by drawing attention to a situation created by a witness already recognized as uncontrollable." (Appellant's Br. at 21.) We disagree. The incident was relevant to show that Moore was biased in favor of Price, *see* Evid. R. 616, which could support an inference that Moore's memory lapses were deliberate efforts to help his friend. It was not unduly prejudicial and, as the defense pointed out, the exchange occurred in open court and may well have been observed by some jurors. (R. at 6620.) *See* Evid. R. 402, 403.

■ As a fourth point, Price says the court should not have allowed testimony that Lisa Wooden, whom Price claimed was present in the apartment with him when the shooting occurred, was arrested for assisting a criminal. The State successfully argued that the testimony was relevant to explain why Wooden was unavailable to testify, and because she could have been the second person a witness saw running from the crime scene. We agree that this evidence was relevant and not, as

Price argues, an impermissible attack on his character.

## II. Claims About Jury Instruction

■ Price raises two challenges to the court's instructions. Jury instructions, like evidentiary issues, lie within the trial court's discretion, and we reverse only when the instructions considered in their entirety misstate the law or otherwise mislead the jury. *Travis v. State*, 488 N.E.2d 342, 345 (Ind.1986).

*A. Preliminary Self Defense Instruction.* Price claims the preliminary instruction on self-defense denied him a fair trial. (Appellant's Br. at 14.) The court instructed the jury that self-defense was an issue in the case and gave a definition of self-defense, but not on the burden of proof for self-defense. The court advised the jurors, "In the event self-defense is an issue in this case, you will be informed by the Court in the Final Instructions as to the burden of proof on this legal defense." (R. at 2140.) Price acknowledges that the final instructions properly explained the burden of proof. (*See* Appellant's Br. at 14–16.)

■ Preliminary and final instructions are considered as a whole, not in isolation. *Bonham v. State*, 644 N.E.2d 1223, 1227 (Ind.1994). Therefore, the court adequately instructed this jury on self-defense.[6]

■ *B. Lesser Included Offenses.* Price also challenges the trial court's preliminary instructions that the defendant was not on trial for any offenses not charged, and that the charges were two counts of murder. He contends that these instructions misstated the law and misled the jury by precluding a verdict that Price

---

6. The defense invoked the Sixth and Fourteenth Amendments when objecting to the instruction. (R. at 5007.) Price does not argue a federal constitutional claim on appeal, however, so we do not address such a claim.

was guilty of a lesser included offense such as voluntary manslaughter. (Appellant's Br. at 30–32.)

This ignores several final instructions on lesser included offenses.[7] Price does not argue that any of these instructions misstated the law, and the instructions made it quite clear that the jury could and should consider lesser included offenses as part of its deliberations.

Price's argument that two preliminary instructions denied him a defense is meritless.

### III. Remorse as a Mitigator

Price argues, "The trial court failed to recognize Mr. Price's genuine remorse regarding the deaths of Mssrs. Black and Northern." (Appellant's Br. at 42.) Price expressed his remorse by saying he knew how it felt to lose a loved one, because his own mother died of natural causes, and that he was "very sorry about what happened." (R. at 7566–67.)

 In *Bonds v. State*, 721 N.E.2d 1238, 1243 (Ind.1999), the defendant said, "I'm remorseful for all what happened. I was just in the wrong place at the wrong time ... I just don't know what went wrong." We rejected his claim that the trial court erred by not finding remorse as a mitigating circumstance, noting that this statement was equivocal at best and "well short of a full acceptance of responsibility." *Id.* The same is true here.

### IV. Order to Pay Fees

In January 1998, the defense moved for a continuance so it could depose additional potential witnesses. The court postponed the trial from April 6, 1998, to October 5, 1998, and ordered all discovery completed by July 27, 1998. On September 30, 1998, the defense again requested a continuance, which the court again granted.

The court found, however, that both the State and defense were guilty of violating the discovery deadline, and assessed each party $2,118.60, saying, "The cost to the County of the jury selection process, to date, is $4,145.20, plus mailing fees of $92 (400 summonses at 23 cents per summons), for a total of $4,237.20." (R. at 1606.)

 Indiana Trial Rule 37(B) authorizes trial courts to impose costs arising out of failure to comply with a discovery order on the party that disobeyed the order. Trial courts "are granted deference in determining what constitutes substantial compliance with discovery orders, and we will affirm their determinations as to violations and sanctions absent clear error and resulting prejudice." *Dye v. State*, 717 N.E.2d 5, 11 (Ind.1999), *cert. denied*, 531 U.S. 957, 121 S.Ct. 379, 148 L.Ed.2d 292 (2000).

---

**7.** Final Instruction Five defined "included offense" and listed voluntary manslaughter and reckless homicide as offenses included in murder. (R. at 2169.) Final Instructions Six and Seven explained the elements of both murder and voluntary manslaughter and said that if "the State failed to prove beyond a reasonable doubt that the Defendant was not acting under sudden heat, you may find the Defendant guilty of Voluntary Manslaughter, a Class A felony." (R. at 2170–71.)

Final Instructions Eight and Nine described reckless homicide as an included offense of murder, defined reckless homicide and listed its required elements; and concluded, "If the State did prove each of these elements beyond a reasonable doubt, you may find the Defendant guilty of Reckless Homicide, a Class C felony." (R. at 2174–75.) Final Instruction Ten instructed the jury to deliberate on the mitigating factor of sudden heat if it found the essential elements of murder proven, and to deliberate on the offense of reckless homicide if it did not. (R. at 2176.) It specifically said, "If the State has proven each of the essential elements of a lesser included offense beyond a reasonable doubt, you may find the Defendant guilty of the lesser included offense." (*Id.*)

Price's attorney argues that the order was improper because the State was entirely to blame, and that the court did not adequately explain the basis for the amount assessed. (Appellant's Br. at 37–41.) We elect not to elaborate on the contentions of the two combatants ("defense noticed tardy depositions" and "State wrongly delayed turning over documents" (*see* Appellee's Br. at 37–38; Appellant's Br. at 37–39)), inasmuch as we are satisfied that the trial judge was within her discretion in finding fault on both sides.

On the other hand, Price is correct that a court imposing penalties of $4,145.20 needs to be somewhat more descriptive about the basis for its calculation than "cost to the county of jury selection, to date." (R. at 1606–07.) It may be that this represents the cost of selecting 400 names from the prospective juror database and printing summonses, but we are left only to guess. The court added the cost of mailing summonses ("400 summonses at 23 cents per summons" (*Id.*)), a completely adequate explanation of that element of the penalty.

Of course, if there is more to be known about why the court's calculation was appropriate, neither party has much incentive to document it. We affirm the postage portion of the penalty and authorize the trial court to enter a more particularized order concerning its penalty should it desire to do so.

### Conclusion

We affirm Price's conviction and sentence, and the court's assessment of costs, with the exception noted immediately above.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.