**James TOWNSEND, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A04–0912–CR–703.

Court of Appeals of Indiana.

July 28, 2010.

Publication Ordered Aug. 23, 2010.

Transfer Denied Sept. 17, 2010.

Michael R. Fisher, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

James Townsend appeals his conviction

and sentence for murder.[1]

We affirm.

### ISSUES

1. Whether there is sufficient evidence to support the conviction.

2. Whether the trial court abused its discretion in instructing the jury.

3. Whether Townsend's sentence is inappropriate pursuant to Indiana Appellate Rule 7(B).

### FACTS

In July and early August of 2008, Townsend lived at 47 South Edmondson Avenue, near East Washington Street; he lived there with several people, including his cousin, Charles Green; and sister, Anise Nicole Carter. The house on Edmondson Avenue had one bathroom; the bathroom's shower curtain was "a dark maroon color." (Tr. 564). Townsend began dating Suzanne Edwards in early July.

At "[a]bout the end of July, beginning of August," Miranda Wood went to Townsend's residence to purchase drugs from Carter. (Tr. 876). After taking Wood's money, Carter refused to let her leave. As Wood tried to get away, Townsend handed Carter a gun, which she recognized as a ".38 revolver . . . [b]ecause that's the only gun that [she had] ever shot before." (Tr. 881). Carter put the gun to Wood's head and began laughing at Wood. Carter then tucked the gun in her waistband. As Wood tried to escape, Carter began to run after her, "and that's when she dropped the gun, it slid out of her pants and she didn't know she dropped it." (Tr. 885). Wood picked up the gun and handed it to Townsend before leaving the house.

During that same summer, twenty-one-year-old Randi Ellis lived with her mother, Merry Sandlin; and friend, Jenny Mathews, at 2152 North Drexel Avenue. In late July of 2008, Krista Kootz introduced Randi to Townsend, who went by the nickname, K.G.

Approximately two days after introducing Randi and Townsend, Krista picked up Randi and Jenny at their house. They "rode around . . . all night" and smoked crack cocaine. (Tr. 304). In the early morning, they drove to Townsend's house, where Kootz introduced Jenny to Townsend. All four eventually left Townsend's house together and drove to "a buddy's house." (Tr. 307). Townsend and Krista subsequently dropped Randi and Jenny off at their residence.

In the afternoon of August 4, 2008, Randi left her house on foot; she returned approximately thirty minutes later. Merry noticed that Randi had written a cell phone number and the initials "K.G." on the palm of her hand. Shortly thereafter, Randi wrote the number 498–5380 and "sexy ass nigga [sic]" under the entry "K.G." in her address book. (Tr. 311). As she made the entry, Randi giggled and seemed "excited." (Tr. 311).

That evening, Randi received and made several telephone calls; the last telephone call came at about 11:00 p.m. Approximately five minutes after the last telephone call, Randi left her house on foot. Randi told Jenny that she was going to meet Townsend at the corner of 21st Street and Drexel Avenue. Jenny watched as Randi walked south, toward East 21st Street; she was wearing a pair of sandals; white belt; white shut; and "pinkish" pants when she left. (Tr. 313). In the meantime, Townsend and Green left Edwards' apartment at approximately 11:00 p.m.

---

**1.** Ind.Code § 35–42–1–1.

At 11:30 p.m., when Randi had failed to return home, Jenny telephoned Townsend's cell phone number. Townsend answered and gave the phone to Randi. Jenny briefly spoke with Randi, who "sounded fine" and told Jenny she would be home in half an hour. (Tr. 316).

Jenny again telephoned Townsend's cell phone about half an hour later, after Randi still had not returned home. Townsend answered and informed Jenny that he had "dropped [Randi] off at some dude's house named Dan." (Tr. 318). Early the next day, on August 5, 2008, Jenny once again telephoned Townsend, who told her that he had dropped Randi off at the "Skyline Motel on Washington . . . with a dude named Dan." (Tr. 319).

Townsend and Green arrived at Edwards' apartment during the early morning of August 5, 2008. Later that day, Townsend and Green told Edwards that they "shot somebody. . . ." (Tr. 571). Specifically,

> [Townsend and Green] was [sic] in the living room and talking and stuff and they were talking to [Edwards] and they went back and forth it was like that they shot somebody and [Edwards] was like, whatever . . . and then they was [sic] like, for real, we shot somebody, and [Townsend] was like, no, Cuzo (phonetic) shot somebody and then [Green] was like no, Cuzo shot somebody and then they was [sic] just going back and forth, . . . back and forth saying they shot somebody. . . . [2]

(Tr. 571–72).

When Edwards indicated that she did not believe them, they took her to the Edmondson Avenue residence. Townsend and Green led Edwards to the garage, where she saw "a girl back there l[ ]ying . . . in the mud behind the garage." (Tr. 572). Edwards noticed that the girl was wearing "pink pants." (Tr. 574). The body was "stiff-looking and real pale." (Tr. 631).

Edwards made Townsend and Green take her back home. Townsend and Green left Edwards' apartment in Edwards' vehicle at approximately 9:00 p.m. At 11:30 p.m., Officer Courtney Harris of the Indianapolis Metropolitan Police Department (the "IMPD") conducted a traffic stop of Townsend; Green was in the front passenger seat. Officer Harris became suspicious when Townsend, who informed Officer Harris that he did not have any identification, "was unsure of how to spell his first name. . . ." (Tr. 778). Also, instead of producing a vehicle registration, Townsend gave Officer Harris a receipt for an oil change.

Officer Harris radioed for assistance and looked up the information given to him by both Townsend and Green. He, however, "was unable to confirm [the identify of] either the driver or the passenger." (Tr. 780).

After back-up officers arrived, they approached the Pontiac from the rear "to get both the driver and passenger out of the vehicle" in order to identify them. (Tr. 782). When the officers were about two feet from the Pontiac, Officer Harris observed Green "lean[ ] towards the driver" before exiting the Pontiac and fleeing. (Tr. 782). Officer Harris observed what appeared to be a revolver in Green's hand. Officer Harris chased Green, who dropped the gun before fleeing into a wooded area. A canine officer apprehended Green approximately forty-five minutes later. In

---

**2.** According to Edwards, Townsend and Green called "each other Cucuz [sic]" as "a figure of speech." (Tr. 636).

the meantime, officers detained Townsend at the scene.

Officer Harris retrieved the gun where Green had dropped it. Officer Harris identified the gun as a six-shot ".38 special revolver." (Tr. 794). Upon examination, he noticed that "one of the live bullets ... was missing from the gun." (Tr. 787). Officer Harris removed five "Winchester .38 special caliber" bullets from the gun's chambers. (Tr. 1012). Officer Harris subsequently checked the gun and the five live bullets into the IMPD's property room.

Officers arrested both Townsend and Green. After he was detained, Townsend requested that someone telephone Edwards on his behalf. Officer David Ellis obliged, informing Edwards that Townsend "would be going to jail for an outright charge as well as on a warrant." (Tr. 817).

When Edwards discovered that Townsend and Green had been arrested, she informed Carter "that there was a dead body and [Townsend] and [Green] took [her] over there to see it." (Tr. 577). Carter then telephoned Townsend's father, James Townsend, Sr. ("James"). Edwards "told him too the same thing [she] had told [Carter]." (Tr. 578).

At "two or three in the morning," Carter and Edwards drove to Townsend's residence. (Tr. 578). There they met James, who instructed Edwards to drive up to the garage. As Edwards waited in the car, James and Carter "got out of the car and went behind the garage and got the girl that was back there and brought her and put her in the trunk of the car." (Tr. 581). Edwards noticed that "there was something wrapped around her and it was dark" in color. (Tr. 581). Once they got the body in the trunk, they tried to close the trunk, but it would not close. "[T]hey kept closing it, [Edwards] could hear cracking and then ... the trunk closed

and they got back in the car...." (Tr. 582).

Edwards then drove to Arlington Avenue and turned right, onto a street "right after Arlington High School." (Tr. 584). She drove past an apartment building before parking at the side of a vacant house. James and Carter exited the vehicle; took the body out of the trunk; and "threw her over a whole bunch of trees...." (Tr. 586). Edwards heard the "popping and snapping and cracking" of tree limbs. (Tr. 586). After dropping off James at the Edmondson Avenue house, Edwards and Carter returned to Edwards' apartment.

After Randi had failed to return or telephone home by the evening of August 5, 2008, Merry reported her to the IMPD as a missing person. After interviewing Merry, Detective Chester Price went to the Skyline Motel on East Washington Street and showed Randi's picture to several people, including the desk clerk. No one recognized or remembered seeing Randi. Detective Price also investigated guests at the motel "with the name Daniel or variations thereof," but found no connection to Randi. (Tr. 206).

During the morning of August 19, 2008, Michael Ellyson, an employee in the Marion County Health Department's mosquito control division, responded to a complaint regarding a mosquito infestation behind an apartment complex near Arlington High School. Ellyson began walking and spraying along a creek, which was below street level and overgrown with vegetation. As he approached the Branbury Road bridge, he "began to smell an odor [sic] what [he] originally thought was a dead animal." (Tr. 229). As he looked around the area, he noticed "what looked like a hot pink pair of pants" with a white belt approximately four feet away. (Tr. 230). Ellyson then saw that the pants and belt were on what appeared to be a decomposed body.

Ellyson reported the body to his supervisor, who telephoned 911.

IMPD Detective Mark Prater responded to the report. He determined that the body probably "had floated down the creek, that it had not been thrown over and dropped" from the bridge or embankment. (Tr. 260–61). He based this after observing that "[t]here were no broken branches on the foliage . . . above the body." (Tr. 261). Also, "a part of the clothing" on the body "was hung up . . . on . . . a twig" as if it had gotten caught as the body floated down the creek. (Tr. 263).

In addition to "reddish-colored" pants and a white belt, Detective Prater noted that "there was some type of garment pulled up around the head area" and that there was no footwear on the body. (Tr. 264). The body also "was in a very high decomposition state," indicating that the body had been there for a period of time. (Tr. 264).

Police officers proceeded to search the area upstream from the body. They discovered a maroon shower curtain in the backyard of a vacant house abutting the creek's bank. The shower curtain "appeared relatively new and it appeared not to have been in the backyard or out in the elements for any length of time." (Tr. 466–67).

Later that day, Detective Prater spoke with Merry, who gave him a description of Ranch's tattoos. A forensic pathologist performed an autopsy on the body the next day. Although the body "was in a state of severe decomposition," the forensic pathologist noted several distinct tattoos. (Tr. 977). The tattoos matched Randi's tattoos, allowing the body to be identified as Randi.

The autopsy revealed that Randi had died from a gunshot wound to the back of her head. The bullet exited through the right temple area. The bullet followed a trajectory "from back to front with a deviation going from left to right and slightly upwards." (Tr. 1055). The forensic pathologist recovered a bullet jacket from the right temple area.

The forensic pathologist opined that death occurred "within a week and a half to three weeks . . . ." (Tr. 995). Other than the gunshot wound, "[a]ny injury that was there at the time of death would have been gone by the time [of] the autopsy" due to decomposition. (Tr. 997). Toxicology tests conducted on muscle samples indicated the presence of cocaine and Xanax.

Detective Prater and Donald Toth, a crime scene specialist with the Marion County Forensic Services Agency (the "Crime Lab"), returned to the area where Randi was found and conducted a search for the bullet. Although they did not recover the bullet, they did recover a sandal near where they recovered the shower curtain. The sandal was lying at the water's edge, indicating that that was where Randi entered the water. That point was approximately 110 feet from where Randi was discovered.

Merry subsequently identified the sandal as Randi's. On August 21, 2008, Jenny identified Townsend from a photographic array as the person she and Ranch met in July and as the person she spoke with on August 4 and 5, 2008.

During the course of his investigation, Detective Prater obtained a search warrant for incoming and outgoing telephone calls on the landline at Randi's residence from August 3, 2008, through August 6, 2008. The record showed several telephone calls made from Townsend's cell phone to Randi's residence the night of August 4, 2008. The record further showed that the last call made from Town-

send's cell phone to Randi's residence was at 10:53 p.m. on August 4, 2008.

Richard Amberger, a forensic scientist with the Crime Lab, test fired the gun discarded by Green. Specifically, he fired two control bullets and two of the bullets found in the gun's chambers. He then compared the spent bullets to the bullet fragment recovered from Randi's skull. Amberger determined that the fragment recovered from Randi was fired from the gun discarded by Green.

On November 7, 2008, a grand jury indicted Townsend and Green on the charge of murder. The trial court commenced a three-day jury trial on September 21, 2009. The jury found Townsend guilty of murder.

The trial court ordered a pre-sentence investigation report ("PSI") and held a sentencing hearing on October 8, 2009. According to the PSI, Townsend was twenty-two years old when he committed the present offense. The PSI showed that Townsend had been adjudicated a juvenile delinquent for committing acts which, if committed by an adult, would have constituted the following: class A misdemeanor battery; class A misdemeanor possession of marijuana; class A misdemeanor criminal trespass;[3] class B misdemeanor public intoxication; and class A misdemeanor resisting law enforcement.

The PSI further showed that, as an adult, Townsend had been convicted of the following: class C misdemeanor driving without a license in 2004; class C felony possession of cocaine in 2005, for which he was sentenced to probation for four years; class D felony criminal recklessness in 2005; and class C felony carrying a handgun without a license in 2006. The State revoked Townsend's probation in 2006. At the time of the present offense, Townsend was serving his sentence for carrying a handgun without a license in the HOCC program.[4]

Additionally, Townsend had been charged with the following: class C misdemeanor driving without a license in 2004 and 2005; two counts of both class C felony intimidation and class A misdemeanor battery in 2006; class A misdemeanor driving with a suspended license in 2008; and class C misdemeanor refusal to identify self in 2008. The State, however, dismissed these charges per plea agreements. The State dismissed a 2004 charge for carrying a handgun without a license because a witness failed to appear. In 2006, Townsend was arrested for class C felony battery and class A misdemeanor domestic battery; the State, however, did not file charges. Also, Townsend was arrested for class C felony carrying a handgun without a license and class D felony obstruction of justice in 2008; again, the State did not file charges.

The PSI further reported that while Townsend was in jail awaiting trial for the present offense, he committed numerous violations, resulting in nineteen incident reports.

Townsend reported having two children but had not been ordered to pay child support. He reported no employment history.

During the sentencing hearing, Townsend proffered as a mitigating circumstance the hardship his incarceration would impose on his children and mother. Townsend did not make a statement at sentencing; rather, his counsel read the

---

3. The juvenile court adjudicated Townsend a delinquent three times for having committed what would constitute criminal trespass.

4. The record does not disclose what the HOCCS program is, but it appears to be a community corrections program.

following statement on his behalf: "I didn't kill this girl. I feel I didn't have a fair trial. I didn't do anything wrong. I'm sorry she's dead but I didn't do it, sorry." (Tr. 1211).

The trial court then found as follows:

[R]egarding the children it looks like paternity's never been established and while he visits the children, there's been no financial support provided.... Also ... your client reports he's never held employment which suggests he's not been a financial contributor to his children. I don't doubt the children are better in an environment where they have a father but ... that's not much of a mitigating factor in this case. I show the three prior felonies as mentioned in the [PSI], the drug possession, criminal recklessness where a house was shot up and the C felony carrying a handgun without a license plus while in Marion County Jail awaiting trial on this case, he acquired 19 write-ups which shows a pretty poor adjustment to the authority represented by the Marion County Sheriff. The only mitigating factors are those represented by the children and the mother and again, those are slight mitigating factors. Every time someone suffers a loss to a family member—almost every time—someone comes in and talks about their personal loss and I feel awfully callous because I have to tell you that while the law recognizes the loss of a human life, the law cannot place more value on one life than on any other. Killing a good person doesn't justify a larger sentence than killing a bad person. You killed a person. So my sentence in no way can reflect the fact that a good family lost a good family member.... I will recognize, however, that the juvenile record, the adult felony record, the behavior while in the Marion County Jail put Mr. Townsend in with the worst of the worst and when you are sentencing someone who is the worst of the worst, you can consider the maximum sentence.

(Tr. 1219–21). Accordingly, the trial court sentenced Townsend to sixty-five years.

Additional facts will be provided as necessary.

## DECISION

### 1. Sufficiency of the Evidence

■ Townsend asserts that there is insufficient evidence to support his conviction.

When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146–47 (Ind.2007) (quotations and citations omitted) We will sustain a judgment based on circumstantial evidence alone if the circumstantial evidence supports a reasonable inference of guilt. *Altes v. State*, 822 N.E.2d 1116, 1121 (Ind.Ct.App.2005), *trans. denied.*

To convict Townsend of murder, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally killed Randi. *See* I.C. § 35–42–1–1. In order to convict Townsend of murder as an accomplice, the State was required to prove that he knowingly or intentionally aided, induced, or caused Green to murder Randi. *See* I.C. § 35–41–2–4.

■■■ An accomplice need not participate in each and every element of a crime to be convicted of it. *Alvies v. State,* 905 N.E.2d 57, 61 (Ind.Ct.App.2009). "While mere presence at the scene of the crime is insufficient to establish accomplice liability, presence may be considered along with the defendant's relation to the one engaged in the crime and the defendant's actions before, during, and after the commission of the crime." *Id.*

The evidence shows that shortly before Randi's death, Townsend possessed a .38 caliber revolver. Townsend was the last person known to have been with Randi before she died. Townsend also lied to Jenny regarding Randi's whereabouts the night she disappeared.

The day after Randi met Townsend, Townsend and Green told Edwards that they had shot someone; each accused the other of shooting "somebody[.]" (Tr. 571). They then showed Edwards the body of a young woman, lying behind Townsend's garage. The body, subsequently identified as Randi, had on clothes matching those worn by Randi when she last left her residence.

An autopsy revealed that Randi died from a single gunshot wound to the head. The fragment produced by the bullet that killed Randi matched fragments produced by a .38 caliber gun discarded by Green after a traffic stop of Townsend's vehicle.

Given the evidence in this case, the jury could reasonably infer that Townsend committed Ranch's murder; or in the alternative, aided, induced, or caused Green to commit her murder. We therefore find the evidence sufficient to support Townsend's conviction.

### 2. *Jury Instructions*

■■■ Townsend asserts that the trial court abused its discretion in instructing the jury on accomplice liability. He also asserts that the trial court abused its discretion in refusing his tendered jury instructions on accomplice liability and his failure to testify.

> "The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." "Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of that discretion." "In reviewing a trial court's decision to give or refuse tendered jury instructions," this Court "considers: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions which are given."

*Gravens v. State,* 836 N.E.2d 490, 493 (Ind. Ct.App.2005) (internal citations omitted), *trans. denied.*

> Before a defendant is entitled to a reversal, he must affirmatively show that the instructional error prejudiced his substantial rights. "Errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the instruction would not likely have impacted the jury's verdict." An instruction error will result in reversal "when we cannot say with complete confidence that a rea-

sonable jury would have rendered a guilty verdict had the instruction been given."

*Filice v. State*, 886 N.E.2d 24, 37 (Ind.Ct. App.2008) (internal citations omitted), *trans. denied.*

### a. *Accomplice liability*

 Townsend challenges the trial court's instruction on accomplice liability. Over Townsend's objection, the trial court instructed the jury as follows:

Mere presence at the scene of a crime, coupled with knowledge that a crime is being committed is insufficient to establish guilt. Further, acquiescence in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding, inducing, or causing a crime.

To convict a Defendant because he aided, induced or caused a crime, you must find, beyond a reasonable doubt, that he knowingly or intentionally participated in some conduct of an affirmative nature.

A person who knowingly or intentionally aids, induces, or causes another person to commit an offense, commits that offense, even if the other person:

1. Has not been prosecuted for the offense;
2. Has not been convicted of the offense; or
3. Has been acquitted of the offense.

There is no distinction between the criminal responsibility of a principal and that of an accomplice.

To convict of a defendant of any crime on an accomplice theory, that is aiding, inducing, or causing a crime, the State must prove beyond a reasonable doubt that the defendant intended by his own voluntary conduct to cause or facilitate commission of the particular crime committed by the principal offender.

A person is responsible for the actions of another person when, either before or during the commission of a crime, he knowingly aids, induces, or causes the other person to commit a crime. To aid is to knowingly support, help, or assist in the commission of a crime.

In order to be held responsible for the actions of another, he need only have knowledge that he is helping in the commission of a crime. He does not have to personally participate in the crime nor does he have to be present when the crime is committed.

*Proof of a defendant's failure to oppose the commission of a crime, companionship with the person committing the offense, and conduct before and after the offense may be considered in determining whether aiding may be inferred.*

(App.353–53) (emphasis added).

The trial court refused Townsend's tendered instruction on accomplice liability. That instruction read as follows: "If the evidence merely tends to establish a suspicion of guilt or the mere opportunity to commit the charged act, it is clearly insufficient to sustain a conviction." (App.271).

Although conceding that the instruction as given is "an accurate statement of the law," Townsend argues that "it is misleading because it tends to emphasize one aspect of the evidence"; specifically, that failure to oppose the commission of the crime may be considered as proof that Townsend aided in the commission of the crime. Townsend's Br. at 6. He maintains that giving his tendered instruction "could have alleviated some of the confusion...." [5] Townsend's Br. at 12.

---

**5.** We note that Townsend contends that the jury instruction given by the trial court "did not impart the information provided by the Indiana Pattern Jury Instruction on accom-

■ "The courts of this State have 'long disapproved' instructions that unduly 'emphasize one particular evidentiary fact, witness, or phase of the case.'" *Fowler v. State,* 900 N.E.2d 770, 773 (Ind.Ct.App. 2009) (quoting *Ham v. State,* 826 N.E.2d 640, 641–42 (Ind.2005)). "'An instruction as to what evidence warrants an inference of guilty clearly invades the jury's province.'" *Id.* (quoting *Crawford v. State,* 550 N.E.2d 759, 761 (Ind.1990)).

> The jury must be instructed that accomplice liability requires proof that the defendant engaged in voluntary conduct in concert with his accomplice. Moreover, an accomplice liability instruction that "draws the focus of the jury away from the total circumstances showing that defendant's knowledge and conduct" is improper.

*Boney v. State,* 880 N.E.2d 279, 293 (Ind. Ct.App.2008) (internal citations omitted), *trans. denied.*

Here, the trial court instructed the jury that "[p]roof of a defendant's failure to oppose the commission of a crime … *may* be considered in determining whether aiding *may* be inferred." (App.353) (emphasis added). The trial court, however, also instructed that "[m]ere presence at the scene of a crime, coupled with knowledge that a crime is being committed is insufficient to establish guilty"; "acquiescence in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding, inducing, or causing a crime"; "the State must prove beyond a reasonable doubt that the defendant intended by his own voluntary conduct to cause or facilitate commission of the particular crime committed by the principal offender"; and to aid a person in committing a crime "is to knowingly support, help, or assist in the commission of a crime." (App.352–53).

Thus, the trial court's instruction "sufficiently informed the jury as to the requirement of finding affirmative action on the part of the defendant before he can be convicted as an accomplice," while also instructing the jury that "passive conduct," including the failure to oppose the crime and acquiescence in it, in and of themselves, is not sufficient to establish accomplice liability. *See Boney,* 880 N.E.2d at 294. We therefore cannot say that the trial court's instruction emphasizes any particular facet of evidence offered to establish the elements of murder. *See Fowler,* 900 N.E.2d at 774 (finding that the accomplice liability instruction did not highlight particular evidentiary facts offered to establish the elements of the crime charged when "it informed the jury that such factors as presence and acquiescence were proper matters for consideration in determining accomplice liability"). We also cannot say that, "with respect to establishing the separate basis of liability," the trial court's instruction misled "the jury to believe that the State had met its burden of proof merely by presenting evidence of [Townsend]'s presence at the crime scene and his failure to oppose commission of the crime." *See id.*

Despite the trial court's extensive admonishment to the jury, Townsend argues that "*conclud[ing]* with an advisement that failure to oppose the commission of the offense and companionship with the person

---

plice liability," including "the analysis of the proof requirements set forth in the pattern instruction." Townsend's Br. at 11. Townsend, however, makes no further argument regarding the failure to use the pattern jury instruction and fails to cite to any authority regarding the preferred use of pattern jury instructions. Thus, he has waived any argument regarding this issue. *See Lyles v. State,* 834 N.E.2d 1035, 1050 (Ind.Ct.App.2005) ("A party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record."), *trans. denied.*

who committed the offense may be considered as evidence of guilt" is prejudicial because it "tends to override and supersede the earlier admonition in the instruction." Townsend's Reply Br. at 3 (emphasis added). We disagree.

Jury instructions must be considered as a whole and in reference to each other. *Snell v. State,* 866 N.E.2d 392, 396 (Ind.Ct. App.2007). "The ruling of the trial court will not be reversed unless the instructions, when taken as a whole, misstate the law or mislead the jury." *Id.* Given that we read instructions as a whole, we find Townsend's argument to be without merit.[6]

Furthermore, Townsend concedes that the given instruction is an accurate statement of the law of accomplice liability, *see* Townsend's Br. at 6; and we agree. *See, e.g., Turner v. State,* 755 N.E.2d 194, 199 (Ind.Ct.App.2001) (noting that "while a defendant's presence during or failure to oppose the crime are, by themselves, insufficient to establish accomplice liability, they may be considered along with defendant's relation to or companionship with the others and defendant's actions before, during and after the crime"), *trans. denied.* We therefore find no abuse of discretion in giving this accomplice liability instruction.

 We also find no abuse of discretion in refusing to give Townsend's tendered instruction. Again, Townsend tendered the following instruction: "If the evidence merely tends to establish a suspicion of guilt or the mere opportunity to commit the charged act, it is clearly insufficient to sustain a conviction." (App.271).

In this case, the trial court instructed the jury that "[t]o convict a defendant of any crime on an accomplice theory ... the State *must prove beyond a reasonable doubt* that the defendant intended by his own voluntary conduct to cause or facilitate commission of the particular crime committed by the principal offender." (App.352–53) (emphasis added). The trial court further instructed the jury that "[i]f the State failed to prove each of these elements [for murder] beyond a reasonable doubt," the jury must find Townsend not guilty. (App.350). Additionally, the trial court instructed the jury that "[m]ere presence at the scene of the crime ... is insufficient to establish guilt" and that to convict Townsend, they must "find, beyond a reasonable doubt, that he knowingly or intentionally participated in some conduct of an affirmative nature." (App.352).

The trial court reasonably informed the jury the basis upon which it could, and could not, convict Townsend. As the trial court adequately covered the substance of Townsend's tendered instruction, we find no abuse of its discretion in refusing to give the instruction.

### b. *Failure to testify*

 Townsend asserts that the trial court abused its discretion in rejecting his tendered jury instruction on failure to testify. Specifically, he argues that instructing the jury regarding his failure to testify during the preliminary phase was inadequate.

 "Preliminary and final instructions are considered as a whole, not in isolation." *Price v. State,* 765 N.E.2d 1245, 1252 (Ind.2002). "[W]here the jury has been fully instructed on all the issues, the order in which it hears the instructions and the evidence provides no basis for a

---

**6.** We also note that the trial court instructed the jury "to consider all of the Instructions together. Do not single out any certain sentence or any individual point and ignore the others." (App.281). "[T]urors are presumed to follow the instructions of the trial court." *Buckner v. State,* 857 N.E.2d 1011, 1016 (Ind. Ct.App.2006).

claim of error." *Phillips v. State,* 550 N.E.2d 1290, 1296 (Ind.1990), *reh'g denied.*

Townsend tendered the following final instruction: "No defendant may be compelled to testify. A defendant has no obligation to testify. The Defendant did not testify. You must not consider this in any way." (App.343). The trial court refused to give the instruction, finding that the language was similar to that of a preliminary instruction. Specifically, the trial court preliminarily instructed the jury as follows:

> Under the law of the State of Indiana, a person charged with the commission of a crime is a competent witness to testify in his or her own behalf. However, a person charged with the commission of a crime cannot be compelled to testify and is under no duty or obligation to testify. The fact that an accused person does not testify must not be considered in any manner by the Jury trying such person.
>
> . . . .
>
> If ... the defendant in this case shall not testify in his own behalf, you are instructed that the fact that he does not testify will raise no presumption of any kind against him; that no inference of any kind can be drawn therefrom by the Jury; and the fact that the defendant does not testify shall not be commented upon, referred to, or in any manner considered by the Jury in determining the guilt or innocence of the defendant.

(App.287).

We find no abuse of discretion in refusing to give a final instruction on Townsend's failure to testify, where the substance of the instruction was covered by a given instruction, notwithstanding that it was given in a preliminary instruction. *See McCarthy v. State,* 751 N.E.2d 753, 755 (Ind.Ct.App.2001) ("[S]o long as the jury hears the instructions on the proper state of the law, whether it hears the instructions before or after the evidence is presented is of no relevance."), *trans. denied.*

Even if we were to find that the trial court improperly refused to give a final instruction on the failure to testify, Townsend has not shown that his substantial rights have been prejudiced. *See id.* (stating that we will reverse a trial court for failure to give a tendered instruction if "the substantial rights of the tendering party would be prejudiced by failure to give it"). In addition to giving the preliminary instruction, the trial court provided a copy of it to the jury for use during deliberations and allowed Townsend's counsel to "re-read" and argue the preliminary instruction to the jury during closing argument (Tr. 1121). Under these circumstances, the omission of a final jury instruction on failure to testify is not grounds for reversal. *Cf. Bridges v. State,* 835 N.E.2d 482, 484 (Ind.2005) (finding that failing to give a final instruction on the jury's right to decide both law and the facts did not warrant reversal when the trial court "re-read its preliminary instructions among the final instructions" and provided the preliminary instructions "in written form for use during deliberations").

Finally, we note that the evidence supports Townsend's conviction for murder. Thus, a reasonable jury would have rendered a guilty verdict even if Townsend's tendered instructions on both accomplice liability and failure to testify had been given. Accordingly, the instruction errors, if any, do not require reversal. *See Filice,* 886 N.E.2d at 37; *Randolph v. State,* 802 N.E.2d 1008, 1013 (Ind.Ct.App.2004) ("Errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the instruction would not likely have impacted the jury's verdict."), *trans. denied.*

### 3. Inappropriate Sentence

Townsend asserts that his sentence is inappropriate. We may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). It is the defendant's burden to " 'persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review.' " *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind.2007) (quoting *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)), *clarified on reh'g*, 875 N.E.2d 218 (Ind.2007).

The standard for reviewing the sentence imposed on an accomplice is the same as it is for principals. *Herron v. State*, 808 N.E.2d 172, 179 (Ind.Ct.App. 2004), *trans. denied.* "The standard provides no categorical benefit to an actor by virtue of his having been charged as an accomplice. Each actor is assessed on the facts available." *Id.*

In determining whether a sentence is inappropriate, the advisory sentence "is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Childress*, 848 N.E.2d at 1081. The advisory sentence for murder is fifty-five years, with a potential maximum sentence of sixty-five years. I.C. § 35–50–2–3. The trial court sentenced Townsend to the maximum sentence.

Townsend argues that his conduct and character do not support the maximum sentence. Generally, "[m]aximum sentences are reserved for the worst offenders and offenses." *Johnson v. State*, 830 N.E.2d 895, 898 (Ind.2005).

With regard to the worst offense and worst offender principle, however, we have previously explained as follows:

> There is a danger in applying [this principle because] [i]f we were to take this language literally, we would reserve the maximum punishment for only the single most heinous offense. In order to determine whether an offense fits that description, we would be required to compare the facts of the case before us with either those of other cases that have been previously decided,—or more problematically—with hypothetical facts calculated to provide a "worst-case scenario" template against which the instant facts can be measured. If the latter were done, one could always envision a way in which the instant facts could be worse. In such case, the worst manifestation of any offense would be hypothetical and not real, and the maximum sentence would never be justified.

> This leads us to conclude the following with respect to deciding whether a case is among the very worst offenses and a defendant among the very worst offenders, thus justifying the maximum sentence: We should concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character.

*Brown v. State*, 760 N.E.2d 243, 247 (Ind. Ct.App.2002), *trans. denied.*

As to the nature of the offense, Townsend arranged to meet Randi, possibly for a date. For no apparent reason, he and Green colluded to shoot Randi in the back of the head and dump her body behind Townsend's garage. Showing no remorse, Townsend later took his girlfriend to view Randi's body.

As to Townsend's character, he has a lengthy criminal history, including several juvenile adjudications and convictions as an adult, including three felony convic-

tions. The current offense is not Townsend's first offense involving violence against another person or a gun.

The record also reflects several dismissed charges and arrests, including a charge that was dismissed because a witness failed to appear. A defendant's record of arrests "may be relevant to the trial court's assessment of the defendant's character in terms of the risk that he will commit another crime." *Cotto v. State,* 829 N.E.2d 520, 526 (Ind.2005).

In addition, Townsend has had his probation revoked and amassed numerous violations while awaiting trial on the present offense. Furthermore, Townsend was serving a sentence when he committed the offense at issue. Clearly, prior attempts to rehabilitate Townsend and deter him from future unlawful conduct have failed. Given the nature of Townsend's offense and character, we are not persuaded that his sentence is inappropriate.

Affirmed.

BAKER, C.J., and CRONE, J., concur.

### ORDER

Appellee, by counsel, has filed a Verified Motion to Publish Memorandum Decision.

Having considered the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. Appellee's Verified Motion to Publish Memorandum Decision is GRANTED.

BAKER, C.J., DARDEN, CRONE, JJ., concur.